2024 IL App (1st) 231588

No. 1-23-1588

Opinion filed October 16, 2024

Third Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 09 CR 15591 |
| | ) | |
| JESUS MENDOZA, | ) | Honorable |
| | ) | Lawrence E. Flood, |
| Defendant-Appellee. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Justices Reyes and D.B. Walker concurred in the judgment and opinion.

**OPINION**

¶ 1     The State appeals the trial court's decision to grant petitioner Jesus Mendoza's third-stage petition for postconviction relief pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)). The trial court held that petitioner's actual innocence claim demonstrated evidence that was new, material, and so conclusive that it would probably change the result on retrial. The State now argues that the trial court's decision was manifestly erroneous.

¶ 2    For the reasons that follow, we affirm the judgment of the trial court.[1]

¶ 3                           I. BACKGROUND

¶ 4    Following a jury trial in 2012, petitioner was convicted of first degree murder involving the use of a firearm and sentenced to a term of 65 years in the Illinois Department of Corrections. On May 22, 2015, we affirmed petitioner's conviction on direct appeal but remanded for clarification of petitioner's sentence, and we recite the trial evidence from that order necessary to a resolution of this case. *People v. Mendoza*, 2015 IL App (1st) 123137-U.

¶ 5    Melissa Moreno testified that on July 17, 2005, she and a group of friends including her brother, Mariano Moreno, Manny Gamboa, Roxana Ruiz, Maher Samad, and Amer Abuasi, planned to go to the beach. The group planned to meet at the Morenos' house. Around noon, Melissa was driving on 71st Street when she noticed a two-tone blue Astro van driving behind her and following her very closely. She recognized the van's passenger as Sergio Mendoza. When Melissa arrived home, she told her brother what had transpired. Mariano, Manny, Maher, and Amer left in Maher's car. Melissa went to pick up Roxana and purchase some things for the beach, and when she returned, she noticed that all four men had returned. She stopped in the street rather than park her car in a parking spot.

¶ 6    Mariano, Maher, and Amer exited Maher's car and were standing near the front end of Melissa's car, talking to her through the driver's side window, when the same blue Astro van turned the corner and stopped in front of her car. Two men exited the van—Sergio and a man Melissa identified as petitioner. Both men were wearing white gloves and carrying black handguns.

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

Petitioner and Sergio fired multiple rounds, re-entered the van, and left. Melissa discovered Manny, who had been shot, lying on his back. He later died from his injuries. Melissa did not tell police about the earlier incident with Mariano and the van at the stoplight because she was scared for her brother and afraid he would get in trouble.

¶ 7     Mariano testified that, after Melissa came home and reported about the blue van, he and three friends went to locate Sergio. They found the van at a stop light, and Mariano approached Sergio in the passenger's seat and confronted him. Sergio exited the vehicle, and the two began fighting. Sergio was unarmed, and Mariano was wearing brass knuckles. The fight lasted two to three minutes. Mariano and the other men returned home, and they were outside talking to Melissa and Roxana when the blue van approached them. Petitioner and Sergio exited the vehicle wearing white gloves and holding handguns. Petitioner and Sergio fired 10 to 12 shots before fleeing. For nearly seven years, until April 2012, Mariano did not tell police any details about the altercation at the stoplight. He told police he did not report it earlier because he was young, scared, and because "murder is a more serious crime."

¶ 8     Maher testified similarly as to the shooting but did not see the incident at the stop light because he remained in the car 50 to 60 feet away. He did not inform police about the incident at the stoplight because he was afraid Mariano would "go to jail for it." He further testified that petitioner exited the van and moved to the front bumper of the van before petitioner started shooting. According to Maher, he and his friends were in the process of exiting his car when petitioner began shooting.

¶ 9     Roxana testified that she was with Melissa when she returned to the house from the store. Melissa stopped her car in the middle of the street, and Mariano, Maher, Amer, and Manny were

across the street. She was still in Melissa's car when the blue van appeared around the corner. The van stopped in front of the four men, and when the shooting began, she took cover inside the car. She was not wearing her glasses at the time and had trouble identifying the perpetrators.

¶ 10   Petitioner presented character evidence from Juan Velaquez, who testified that petitioner was a "peaceable person" who never caused problems. Petitioner did not testify, and his closing argument relied on a theory of misidentification and the State's failure to meet its burden of proof.

¶ 11   The jury returned a guilty verdict, and the trial court sentenced petitioner to 50 years' imprisonment for the murder, and an additional 15 years for the firearm enhancement. Of significance to the issue now before us, petitioner's brother, Sergio, was not tried with petitioner. In fact, he was not tried until 2017 when he was extradited from Mexico.

¶ 12   During pretrial proceedings petitioner sought to take an evidence deposition of Amer because Amer was preparing to surrender himself to law enforcement in Ohio. Petitioner's trial counsel later informed the trial court that an evidence deposition would not be necessary. On June 8, 2012, prior to trial, Amer appeared in court pursuant to a subpoena, and the trial court continued that subpoena until the trial date the following month. However, Amer did not appear at trial in response to the subpoena, and the defense rested without calling Amer.

¶ 13   On January 22, 2018, petitioner filed a petition for postconviction relief. That petition alleged that Sergio was acquitted at his trial in 2017, and that the additional testimony of Amer and Sergio, demonstrated that petitioner was actually innocent.

¶ 14   On January 14, 2020, the State filed a motion to dismiss the petition, claiming that it was untimely, and that petitioner failed to state the requirements of an actual innocence claim. The trial

court denied that motion, and the case proceeded to an evidentiary hearing that was held on May 8, 2023.

¶ 15    At that hearing, Amer testified remotely from a correctional institution in Ohio. He testified that on the morning of the shooting, he was with his cousin, Maher, and his friends Mariano and Manny. They drove to Mariano's house to find Melissa outside panicking. She was jumping up and down, crying, and claiming that a van had tried to ram her. She pointed at a van driving off down the street, and all four men went after the van. They eventually caught up with the van and cut it off. Maher stayed in the vehicle while Amer and Manny went to the driver's window of the van, and Mariano went to the passenger's side window where Sergio was sitting. Manny held a pocketknife to the driver's throat, and Mariano put on brass knuckles and began punching Sergio in the face repeatedly while Sergio was sitting in the vehicle. According to Amer, Sergio never exited the vehicle. The men got back in the car and returned to Mariano's house, where they remained in the car. A couple minutes later, he heard tires screeching and saw the same van behind them. He was the first one to exit the car and thought a fight was about to start. He began moving toward the van first, and the van's driver then exited the van and started shooting. Sergio never exited the van. After the shooter got back in the van and it drove off, Amer checked on Manny, who was lying on the ground. Manny had his knife in his hand, and Amer was attempting to conceal it when the police arrived.

¶ 16    Amer testified that the day he came to the courthouse for petitioner's trial, he and his cousin were chased by four men. They got scared and returned to the airport and went back to Cleveland.

¶ 17    Terrence Meehan, an investigator for the Cook County State's Attorney's Office, testified that he interviewed Amer on November 30, 2022, regarding the shooting of Manny and the events of that day. Amer told him that Sergio's face was swollen shut because of the attack against him.

¶ 18    Sergio testified that on the day in question, he was in the van with petitioner, who was driving, when he noticed a car begin following them. At a stoplight, four men exited the vehicle. Mariano began hitting Sergio through the window while wearing brass knuckles, and another man had a knife to petitioner's neck. Sergio's face was bleeding, and there was blood all over his clothes. During the encounter he feared for his life, and he never tried to exit the van, but the men attacking him tried to open the door to get him out of the vehicle.

¶ 19    When Sergio and petitioner drove away, they were afraid of being followed home, so they drove around randomly. After a minute or minute and a half of driving, they turned onto another street where their van was blocked by a car in the street, and the same men approached, still armed with a knife and brass knuckles. Sergio and petitioner feared for their lives, and petitioner defended them by shooting at their attackers. Sergio testified that he and petitioner fled to Memphis after the shooting, and he subsequently returned to Mexico. He remained in Mexico during petitioner's trial, and did not return until he was extradited back to the United States. He denied firing a gun during the incident.

¶ 20    Petitioner testified that on the day in question, he was driving his van with Sergio in the passenger seat. When they were stopped at a stoplight, four men approached the car. Two men approached the driver's side door and one of them threatened petitioner with a knife and told him not to move. Two men approached the passenger's side, and one of the men began hitting Sergio with brass knuckles. According to petitioner, some of the men were trying to remove Sergio from

the van. As soon as petitioner no longer felt the knife against his neck, he pressed the gas pedal and drove away. He drove for no more than a couple minutes, but even though he lived nearby, he did not go home out of fear of his assailants finding out where he lived. As he was driving, he turned from 72nd Street onto Lawndale Avenue in Chicago, Illinois, and saw Mariano, who ran in front of the van. Petitioner hit the brakes so he would not hit Mariano, and Mariano approached the van carrying an L-shaped tire iron. He then saw the other men who had attacked them running toward the van, and they were carrying other objects, including one which petitioner thought was a bat.

¶ 21    Petitioner was terrified that the men were going to kill him, so he withdrew a gun from the glovebox and fired at one of the cars in an attempt to scare the men off. He testified that Sergio never exited the van and never had a gun. He did not simply keep driving because Mariano was blocking the van with his body.

¶ 22    Several exhibits were admitted into evidence, including an affidavit from petitioner's trial attorney, Stephen Richards. Richards averred that he intended to call Amer as a witness at trial, but that Amer was absent on the day Richards intended to call him. Petitioner also submitted the transcripts from Sergio's trial in 2017, at which both Amer and Sergio testified. The exhibits reflect that both men testified in a manner consistent with their testimony at petitioner's evidentiary hearing.

¶ 23    Moreover, Mariano also testified at Sergio's trial, but his testimony contained several important differences compared to his testimony at petitioner's trial. At Sergio's trial, he testified that he forcibly removed Sergio from the van at the stoplight before the two began fighting. He also acknowledged that Manny held a pocket knife to petitioner's throat to prevent petitioner from

exiting the vehicle to help Sergio, whereas he made no mention of the pocketknife at petitioner's trial. However, in his testimony at Sergio's trial, Mariano insisted that Manny told petitioner, "I'm not going to use this. I have no intention of using this, but just let it be a one on one fight."

¶ 24    At petitioner's trial, Mariano could not remember if Sergio was bleeding, but at Sergio's trial, he admitted that Sergio was bleeding from his eye. Additionally, at petitioner's trial, Mariano testified he ran toward the van after the shooting stopped so he could get a good look at the shooters' faces—even though he had been punching the van's passenger only minutes earlier.

¶ 25    At Sergio's trial, he testified he ran up to the van as it pulled away and Sergio pushed the barrel of his revolver into Mariano's chest and pulled the trigger, but the gun was empty. He also said he had known Sergio for multiple years before the shooting and considered him a friend in that he considers neighbors who live in the area friends. Furthermore, he admitted telling an assistant state's attorney following the shooting that he did not know Sergio's name.

¶ 26    On July 26, 2023, the trial court, which presided over the trials of both petitioner and Sergio, vacated petitioner's conviction and ordered a new trial. The State's appeal followed.

¶ 27                                          II. ANALYSIS

¶ 28    The State now appeals the trial court's order that vacated petitioner's conviction and ordered a new trial. It argues that the trial court's ruling was manifestly erroneous and that defendant forfeited his ability to claim he acted in self-defense.

¶ 29    The Act provides a three-step process by which a criminal defendant may challenge his conviction or sentence for violations of federal or state constitutional rights. *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006). The purpose of postconviction proceedings is to allow inquiry into

constitutional issues involved in the original conviction and sentence that have not been, and could not have been, adjudicated previously on appeal. *People v. Buffer*, 2019 IL 122327, ¶ 12.

¶ 30 One form of postconviction relief available to petitioners is that of a claim that the petitioner is actually innocent. This collateral challenge is "based on principles of fundamental fairness and borne out of our constitutional obligation to afford a person who presents new evidence that persuasively indicates that he or she is factually innocent with the additional process necessary to prevent a fundamental miscarriage of justice." *People v. Taliani*, 2021 IL 125891, ¶ 67. "Our express reason for allowing a freestanding claim of actual innocence to be cognizable under our Post-Conviction Hearing Act is our firm belief that allowing an innocent person to remain incarcerated would offend all notions of fairness and due process." *Id.* (citing *People v. Washington*, 171 Ill. 2d 475, 488-89 (1996)).

¶ 31 Once a petition is advanced to the third stage of the process, an evidentiary hearing is held where the trial court may engage in fact-finding and credibility determinations. *Pendleton*, 223 Ill. 2d at 473. We will not reverse the trial court's decision after a third-stage hearing unless it is manifestly erroneous. *Id.* A manifest error is one that is "clearly evident, plain, and indisputable." (Internal quotation marks omitted.) *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009).

¶ 32                                         A. Forfeiture

¶ 33 We address the State's forfeiture argument first, which it raises for the first time on appeal. The State argues that petitioner forfeited his claim that he acted in self-defense because he failed to raise a claim of self-defense at trial. However, as petitioner rightly points out, the State has forfeited this claim in turn by failing to raise it below. The State's motion to dismiss only argued that the instant postconviction petition was untimely filed and that petitioner failed to state an

actual innocence claim. The State forfeits a nonjurisdictional procedural challenge to a postconviction petition when it fails to raise that challenge in a motion to dismiss. *People v. Cowart*, 2015 IL App (1st) 131073, ¶ 11. In any event, the State's argument that petitioner forfeited his self-defense claim is based in part on a case where the defendant argued for the first time on direct appeal that the affirmative defense of necessity rendered the evidence insufficient to prove her guilty of the offense. *People v. Shepherd*, 2020 IL App (1st) 172706, ¶¶ 16-17. We held that such an argument was forfeited because an affirmative defense requires the State to rebut that evidence, and the State loses its ability to do so when that affirmative defense is not raised at trial. *Id.* ¶ 17. But that is not an issue in a postconviction case, such as this one, where the question is whether petitioner is entitled to a new trial at which he could present evidence of self-defense, and the State would have the opportunity to rebut it.

¶ 34    Furthermore, we doubt that forfeiture could apply to actual innocence claims. The only case provided by the State that involves forfeiture of an actual innocence claim is *People v. Montes*, 2015 IL App (2d) 140485, ¶ 19, which held that an actual innocence claim alleging entrapment was forfeited because the defendant did not raise that defense at trial. However, the reasoning in *Montes* is flawed, and we decline to follow it. *Montes* relied on two separate cases for its conclusion, *People v. Fleming*, 50 Ill. 2d 141 (1971), and *People v. Davis*, 2014 IL 115595. *Fleming* is similar to *Shepherd* in that the defendant attempted, improperly, to raise the affirmative defense of entrapment for the first time on direct appeal. *Fleming*, 50 Ill. 2d at 144. Notably, he did so after testifying at trial that he did not commit the offense. *Id.* Likewise, *Davis* only recited general principles for postconviction petitions, including that issues decided on direct appeal are barred by *res judicata*, and issues that could have been raised on direct appeal, but were not, are

forfeited. *Davis*, 2014 IL 115595, ¶ 13. Neither of those cases involved actual innocence claims. Therefore, *Montes*'s decision to extend forfeiture principles to an actual innocence claim is based on authority that had nothing to do with actual innocence claims, including one case that did not concern the Act. We decline to adopt that reasoning. We also cannot ignore the due process concerns that militate against the notion of applying forfeiture to actual innocence claims.

¶ 35 We permit actual innocence claims out of a belief that forcing a demonstrably innocent person to remain in prison offends all notions of fairness and due process. *Taliani*, 2021 IL 125891, ¶ 67 (citing *Washington*, 171 Ill. 2d at 488-89). Finding an actual innocence claim to be forfeited would obliterate the very purpose of actual innocence claims. The essence of an actual innocence claim is that the evidence in question is new and could not have been discovered sooner. If the evidence at the heart of the claim could not have been discovered sooner, how could the claim be forfeited? And if the evidence could have been discovered sooner, the newly discovered element of an actual innocence claim would see that claim fail anyway. Thus, the notion of applying forfeiture to actual innocence claims is illogical.

¶ 36 Moreover, as petitioner points out, actual innocence claims are cognizable even after a defendant pleads guilty. *People v. Reed*, 2020 IL 124940, ¶ 41. In *Reed*, our supreme court refused "to turn a blind eye to the manifest injustice and failure of our criminal justice system that would result from the continued incarceration of a demonstrably innocent person, even where a defendant pleads guilty." *Id.* If pleading guilty, which normally waives all nonjurisdictional defenses and defects (*id.* ¶ 27), still permits actual innocence claims, then it would follow that forfeiture would not apply here. It would be similarly unjust here to find that petitioner forfeited his ability to offer a particular defense simply by remaining silent, where successfully arguing self-defense was a

practical impossibility without the testimony of two critical witnesses whose unavailability was beyond his control, as we discuss below.

¶ 37    Finally, the State argues that petitioner forfeited his actual innocence claim because he failed to argue on direct appeal that his trial counsel was ineffective for failing to raise self-defense. This argument can be disposed of by relying on rudimentary rules of appellate procedure. Petitioner clearly could not have raised such a claim on direct appeal because it would have required reference to matters outside the record, which is not permitted. See *Keener v. City of Herrin*, 235 Ill. 2d 338, 346 (2009) (parties generally may not rely on matters outside the record, and when a party's brief fails to comply with a rule, a court of review may strike the brief or disregard the inappropriate material).

¶ 38    In any event, a claim of ineffective assistance of trial counsel is simply not the same as an actual innocence claim. Actual innocence claims, even repeated claims of actual innocence, can be raised so long as the evidence is newly discovered. *Ortiz*, 235 Ill. 2d at 333. Actual innocence claims are also not subject to the cause-and-prejudice test, which is intended to promote finality in litigation. *Davis*, 2014 IL 115595 ¶ 14. Instead, they are governed only by the three-element test recited below. This further supports the notion that the imposition of forfeiture in a case like this is inappropriate.

¶ 39    Accordingly, the State forfeited its forfeiture argument by not raising it in its motion to dismiss. But even considering the State's argument in full, we remain unconvinced that petitioner's actual innocence claim was forfeited.

¶ 40                                B. Actual Innocence

¶ 41    The State next argues that the trial court erred in finding that petitioner's evidence was newly discovered and conclusive, which we address in turn. The State does not argue that petitioner's additional evidence is not material, so we need not address that.

¶ 42    To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶ 47. Newly discovered evidence is evidence that was discovered after trial and that the petitioner could not have discovered earlier through the exercise of due diligence. *Id.* Evidence is material if it is relevant and probative of the petitioner's innocence. *Id.* Noncumulative evidence adds to the information that the fact finder heard at trial. *Id.* Lastly, the conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result. *Id.* The conclusive character element of new evidence is the most important element of an actual innocence claim. *Id.*

¶ 43    Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. *Id.* ¶ 48. The new evidence need not be entirely dispositive to be likely to alter the result on retrial. *Id.* Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence. *Id.*

¶ 44                                    1. Newly Discovered

¶ 45    The State contends that petitioner's evidence is not newly discovered because petitioner would have always known that he acted in self-defense and therefore could have testified to that version of events at trial. According to the State, evidence is not newly discovered, even if provided by other witnesses, if a defendant could have testified all along that he did not commit the charged offense. The illogic of that argument is plain because that would necessarily foreclose the vast majority of actual innocence claims—a defendant could always choose to take the stand and proclaim his innocence.

¶ 46    Using this logic, the State argues that Amer's testimony does not constitute newly discovered evidence and points us to *Montes*, 2015 IL App (2d) 140485. In *Montes*, the defendant was convicted of attempted first degree murder, and he subsequently filed a postconviction petition alleging his actual innocence. *Id.* ¶¶ 1, 12. The defendant attached an affidavit from a witness that contradicted the testimony of the State's chief witness as to defendant's involvement in the crime and that the defendant claimed supported a defense of entrapment. *Id.* ¶ 12. An affidavit from the defendant's trial attorney averred that this witness was never interviewed because the attorney understood the witness to be facing multiple criminal charges and was unavailable. *Id.* ¶ 13. In holding that the defendant's evidence was not newly discovered, the appellate court cited *People v. Barnslater* for the proposition that it must be the facts that are newly discovered and that evidence is not newly discovered if it presents facts already known to the defendant. *Id.* ¶ 24 (citing *People v. Barnslater*, 373 Ill. App. 3d 512, 523 (2007)).

¶ 47    However, as petitioner points out, *Barnslater*, and *Montes*'s reliance upon it, is at odds with decisions of our supreme court. In *People v. Edwards*, 2012 IL 111711, ¶ 38., our supreme

- 14 -

court held that the affidavit of a codefendant was newly discovered, even though the defendant knew of the codefendant at the time of trial, because the codefendant was "unavailable" and no amount of diligence could have forced the codefendant to surrender his right to avoid self-incrimination. This Court has since endorsed that reasoning.

¶ 48    In *People v. Fields*, we reasoned that it is evidence that must be newly discovered and not necessarily the source. *People v. Fields*, 2020 IL App (1st) 151735, ¶ 48 (citing *Edwards*, 2012 IL 111711, ¶ 32). Therefore, an affidavit may be newly discovered even when the defense knew of the witness prior to trial. *Id.* (citing *People v. White*, 2014 IL App (1st) 130007, ¶ 20).

¶ 49    *White* is particularly instructive on this topic. There, the defendant was convicted of first degree murder following a shooting at a gas station. *White*, 2014 IL App (1st) 130007, ¶¶ 1, 5. Multiple witnesses identified the defendant as the shooter, though one of the witnesses later recanted her grand jury testimony at trial and testified that she did not know who shot the victim. *Id.* ¶¶ 5-7. Following his conviction, the defendant sought postconviction relief and attached an affidavit from David Jennings, the victim's cousin. *Id.* ¶¶ 12-13. Jennings averred that he saw who shot the victim and that it was not the defendant. *Id.* ¶ 13. However, Ajani Brown, the victim's brother, was upset that Jennings did not return fire at the shooter and that, "later, after a show of force near Jennings's grandmother'[s] home," Ajani told Jennings to say the defendant was the shooter and that Ajani would harm Jennings if he did not comply. *Id.* ¶ 14. Jennings further averred that he made no attempt to speak to an attorney or investigator for the defendant and that he would not have spoken to them if they had contacted him. *Id.* He averred that he was reluctant to speak with counsel in relation to the postconviction petition and even more reluctant to complete an affidavit, but he felt it was the right thing to do. *Id.*

¶ 50    The State argued, as it does here, that Jennings's evidence was not newly discovered because the defendant knew of and attempted to interview Jennings. *Id.* ¶ 20. We disagreed and, construing the defendant's allegations as true, reasoned that, "no amount of diligence *** could have compelled Jennings to testify to the statements in his affidavit sooner." *Id.* ¶ 22. Critically, in *White*, the issue was whether the defendant's petition was sufficient to survive the first stage, where we review the pleadings *de novo* and are not required to show any deference to the trial court. *Id.* ¶ 18.

¶ 51    That is not the case here, where the trial court's determinations are entitled to deference unless they are manifestly erroneous. *Pendleton*, 223 Ill. 2d at 473. We cannot say that the trial court so erred in finding that Amer's testimony was newly discovered. Amer was subject to the compulsory power of a subpoena to appear at petitioner's trial but did not appear because he was followed by multiple men on the way to the courthouse, feared for his own safety, and returned to Cleveland. While the State questions petitioner's due diligence in securing Amer's attendance at trial, it is difficult to imagine what else he could have done. Amer had previously appeared in court and been notified that his subpoena was continued to the trial date, and when he failed to appear to testify in the middle of petitioner's jury trial after the State had presented its case-in-chief, securing a continuance seemed unlikely—particularly because petitioner had no knowledge at the time of why Amer failed to appear.

¶ 52    Likewise, the State faults petitioner for not taking the State up on its offer during pretrial proceedings to bring Amer back as their witness. But Amer had already appeared in court pretrial pursuant to a subpoena and was advised that his subpoena was continued until the trial date— petitioner had no reason to request the State's help in securing Amer's attendance. Even assuming

- 16 -

the State's willingness to assist, Amer lived in Ohio and was not in the State's control in the leadup to trial. When he failed to appear, there was nothing the State could have done to remedy that. The notion that the exercise of due diligence required petitioner to ask his opponent for help it was powerless to give is one we reject. Like the witness in *White*, Amer made himself unavailable at the time of petitioner's trial. He fled back to another state after fearing for his own safety and compulsory process was inadequate to secure his attendance. How else should petitioner have compelled Amer's attendance but for the mechanism designed to do precisely that? Accordingly, the trial court did not commit manifest error in finding that this evidence was newly discovered.

¶ 53 The State makes a similar argument with respect to Sergio's testimony—that petitioner knew of the facts to which Sergio would testify all along. For the same reasons as Amer's testimony, we reject that argument. But Sergio's unavailability was even more compelling. Sergio was ultimately charged with the same offense and therefore no amount of due diligence could have compelled him to surrender his right to avoid incriminating himself. *Edwards*, 2012 IL 111711, ¶ 38. In one sentence, the State insists that Sergio's testimony was not newly discovered, and in the next, it acknowledges that the testimony of a codefendant generally satisfies the "newly discovered" requirement precisely because he cannot be compelled to relinquish his fifth amendment rights. In other words, the State appears to concede that Sergio's testimony is newly discovered without explicitly doing so. Moreover, Sergio fled to Mexico and was only extradited years after petitioner's trial for his own trial in 2017. He was not in the country at the time of petitioner's trial. Thus, Sergio was also unavailable, and no amount of due diligence could have obtained his testimony at petitioner's trial. Accordingly, the trial court also did not commit manifest error in finding Sergio's testimony to be newly discovered.

¶ 54     Finally, the State argues that petitioner's own testimony does not contain newly discovered evidence because petitioner would have known all along that he acted in self-defense. That fact is, of course, self-evident. But it also does not render the trial court's decision a manifest error because the testimony of Amer and Sergio was newly discovered. Additionally, petitioner's testimony established the materiality and conclusiveness of Amer's and Sergio's testimony. While Amer and Sergio offered testimony that tended to show petitioner acted in self-defense, the significance of that evidence was largely contingent on proof that petitioner truly did act in self-defense—neither Amer nor Sergio could testify to petitioner's state of mind. And clearly, even if petitioner's own state of mind and version of events were not newly discovered, that does not mean he cannot testify to it upon retrial.

¶ 55     Accordingly, the trial court did not commit manifest error in determining that petitioner presented newly discovered evidence in the form of Amer's and Sergio's testimony.

¶ 56                                2. Conclusive

¶ 57     Next, we consider whether petitioner's evidence is so conclusive that it would probably change the result on retrial. *Robinson*, 2020 IL 123849, ¶ 47. We agree with the trial court that petitioner's new evidence undermines confidence in the outcome of petitioner's trial, particularly when we, as the State urges us to do, consider the new evidence in the context of the trial evidence.

¶ 58     Petitioner's new evidence paints an entirely different picture of what transpired on the day in question. The version of events told at trial portrayed the altercation at the stoplight as being some sort of honorable mutual combat, followed by an entirely unjustified revenge killing. Within the context of petitioner's trial, Mariano and Maher were already guilty of a lie of omission—they

admitted that they did not tell police about the altercation at the stoplight until 2012, seven years after the shooting.

¶ 59     To consider the conclusiveness of the new evidence, we can first look to Mariano's own testimony. At Sergio's trial, Mariano admitted to pulling Sergio from the van while the decedent held a knife to petitioner's throat, but at petitioner's trial, he claimed Sergio exited the vehicle on his own and made no mention of the knife. At petitioner's trial, Mariano insisted he ran toward the van as it pulled away so he could get a better look at the shooters, even though only minutes earlier he was punching one of the men in the face. At Sergio's trial, he testified he ran at the van and Sergio put the barrel of his gun to Mariano's chest and pulled the trigger, but the gun was empty. He also testified that he knew Sergio from the neighborhood, but that he told an assistant state's attorney soon after the shooting that he did not know Sergio. The fact that Mariano's version of events morphed over time, coming ever closer to the version of events told by Amer and Sergio, is the starting point for how our confidence in the outcome of petitioner's trial has been undermined.

¶ 60     Furthermore, Mariano's testimony at both trials was that he and the other men were standing by Melissa's car, talking to her through her window, when petitioner and Sergio arrived and the shooting began. But Maher's testimony at petitioner's trial was that the men were just exiting Maher's car when the shooting began.

¶ 61     This court has carefully reviewed Mariano's testimony between the two trials. There are multiple reasons to doubt his version of events even before we consider petitioner's newly discovered evidence. Both Amer and Sergio provided accounts of the two separate incidents that were largely consistent with each other, and with petitioner's testimony. Moreover, Amer was

friends with Mariano, Maher, and the decedent, and no testimony established a motive for him to lie in support of petitioner or Sergio's version of events.

¶ 62    Amer's and Sergio's testimony described a version of events where Mariano and the decedent took violent action with no justification. Under that account, the decedent held a deadly weapon to petitioner's throat while Mariano punched Sergio repeatedly with brass knuckles until Sergio's face was swollen and bleeding. Moreover, the testimony of Amer and Sergio also described a version of events where, in the moments just before the shooting, the group of individuals including the decedent approached petitioner's van a second time, again armed with weapons. Sergio's testimony maintained that the decedent was once again armed with a knife at the time he was shot, and Amer's testimony corroborated that by maintaining that he found the decedent on the ground holding the knife and that he was attempting to conceal the knife when the police arrived.

¶ 63    Additionally, there is another critical fact that warrants mention: Sergio was acquitted of first degree murder at his trial in 2017, and the same trial judge that presided over petitioner's evidentiary hearing also presided over both trials and was able to observe the demeanor and credibility of witnesses across all three proceedings.

¶ 64    Petitioner's new evidence and Sergio's evidence at trial, it must be noted, maintained that only petitioner fired a gun. Amer and Sergio both testified that only petitioner fired a gun and that Sergio remained in the car, which no doubt affects the examination of Sergio's conduct in his own case when compared to petitioner's conduct in this case. However, the jury in Sergio's case was instructed on the law of accountability and thus could have found Sergio guilty of first degree murder based on petitioner's conduct. It chose not to do so. We can never say for certain what

factors led the jury to acquit Sergio, nor can we say definitively whether Amer's and Sergio's testimony would result in an acquittal here. But we also do not need to go that far. The trial court was not called upon to decide if it completely believed petitioner's version of events. Its task was only to decide if petitioner's new evidence undermined its confidence in the outcome of petitioner's trial. Given the inconsistencies apparent in some of the State's evidence between both trials, contrasted with the very different version of events contained in petitioner's new evidence that sheds new light on the circumstances of the shooting, we cannot say that the trial court's decision was manifestly erroneous.

¶ 65    The State argues that petitioner's new evidence is not conclusive because the encounter at the stoplight could not be a basis for petitioner to fire in self-defense, citing to *People v. De Oca*, 238 Ill. App. 3d 362, 368 (1992), for the proposition that the right to use force to defend oneself does not justify killing the original aggressor after the aggressor abandons the quarrel. While that is an accurate statement of the law, the State's argument misses the point entirely. The encounter at the stoplight is quintessential *Lynch* evidence. In *People v. Lynch*, 104 Ill. 2d 194, 199-200 (1984), our supreme court held that a victim's aggressive or violent character may tend to support a theory of self-defense in two ways. The first way is relevant here:

"[T]he defendant's knowledge of the victim's violent tendencies necessarily affects his perceptions of and reactions to the victim's behavior. The same deadly force that would be unreasonable in an altercation with a presumably peaceful citizen may be reasonable in response to similar behavior by a man of known violent and aggressive tendencies. One can only consider facts one knows, however, and evidence of the victim's character is

irrelevant to this theory of self-defense unless the defendant knew of the victim's violent nature." *Id.* at 200.

¶ 66    The incident at the stoplight, according to the testimony at the evidentiary hearing, reflects that the decedent held a knife to petitioner's throat while Mariano punched Sergio in the face repeatedly with brass knuckles. The testimony of Amer, Sergio, and petitioner also substantiated that, during the second encounter, the decedent and his friends approached the van armed with weapons *before* petitioner exited the vehicle. While the incident at the stoplight had terminated and was not, in and of itself, the justification for petitioner to fire, it was unquestionably significant *Lynch* evidence because it could have informed petitioner's perceptions and reactions as the group of men approached the van armed during the second incident that precipitated the shooting.

¶ 67    The State also insists that shooting a gun in self-defense here could not be reasonable, and therefore petitioner's new evidence is not conclusive because petitioner was inside the van and Mariano and others did not have firearms. To support that argument, it cites to *People v. Lewis*, 2012 IL App (1st) 102089, and *People v. Lee*, 243 Ill. App. 3d 1038, 1043 (1993). In *Lewis*, the defendant was unreasonable in shooting an unarmed man after first encouraging his brother to fight the victim. *Lewis*, 2012 IL App (1st) 102089, ¶ 18. In *Lee*, the defendant was unreasonable in shooting an unarmed man who, though he was the initial aggressor, had been disarmed or disabled. *Lee*, 243 Ill. App. 3d at 1043. *Lewis* is factually distinguishable on the basis that, under petitioner's version of events here, the decedent and at least some of his friends were armed with weapons they had used to attack petitioner and his brother once before. *Lee* is distinguishable because, here, petitioner's version of events maintains that the decedent and his friends had not been disarmed and were, in fact, approaching the van the second time armed with weapons.

¶ 68    To the State's point that the decedent and others were not armed with firearms, self-defense does not require mutual gladiatorial combat. A person may use force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another or the commission of a forcible felony. 720 ILCS 5/7-1 (West 2018). So long as one reasonably believes they are facing imminent death or great bodily harm, the use of force likely to cause death or bodily harm is justified. *Id.* Self-defense does not require that the various parties be armed with equivalent weapons.

¶ 69    And the State's point that petitioner was inside the van and therefore apparently safe stretches credulity. Being inside the van did not protect Sergio and petitioner the first time, as even Mariano admitted at Sergio's trial that he pulled Sergio out of the van and the decedent held a knife to petitioner. The way forward during the second encounter, according to petitioner's evidence, was blocked, and the State asks why petitioner could not have reversed and removed himself from the situation. But the answer is simple: petitioner was on a public street and had no duty to retreat. *People v. Willingham*, 2020 IL App (1st) 162250, ¶ 36 (citing *People v. White*, 265 Ill. App. 3d 642, 651 (1994)).

¶ 70    As we have said, we need not determine conclusively whether petitioner's actions were reasonable. Ultimately, petitioner's intentions, what truly transpired during both incidents, and whether petitioner acted reasonably, are for the fact finder to decide at trial. The only question before us is whether the trial court committed manifest error, that is, an error that is clearly evident, plain, and indisputable. *Ortiz*, 235 Ill. 2d at 333. The trial court committed no such error here. Given Mariano's shifting testimony between trials, the new and largely consistent accounts of Amer and Sergio, as well as petitioner's claims that he acted out of fear for his own life, and the

fact that Sergio was acquitted using the same evidence, our confidence in the outcome in this case is shaken. The trial court's ruling was not manifestly erroneous.

¶ 71                                III. CONCLUSION

¶ 72     For the foregoing reasons, we affirm the judgment of the trial court.

¶ 73     Affirmed.

---

### *People v. Mendoza*, **2024 IL App (1st) 231588**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 09-CR-15591; the Hon. Lawrence E. Flood, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, John E. Nowak, and Amy M. McGowan, Assistant State's Attorneys, of counsel), for the People. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | James E. Chadd, Douglas R. Hoff, and S. Amanda Ingram, of State Appellate Defender's Office, of Chicago, for appellee. |

---