2024 IL App (2d) 230539
No. 2-23-0539
Opinion filed December 3, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of McHenry County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 11-CF-520 |
| | ) | |
| TIMOTHY S. SMITH, | ) ) | Honorable James S. Cowlin, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Presiding Justice Kennedy and Justice Mullen concurred in the judgment and opinion.

**OPINION**

¶ 1    The defendant, Timothy S. Smith, was convicted of first degree murder (720 ILCS 5/9-1(a)(2) (West 2012)) by a McHenry County jury in 2013 for the shooting death of Kurt Milliman. We reversed on appeal, holding that the trial court erred in not giving the jury instructions on involuntary manslaughter. *People v. Smith*, 2015 IL App (2d) 130663-U (*Smith I*). On remand, the defendant waived his right to a jury trial and proceeded to a bench trial. The trial court found him guilty of first degree murder and sentenced him to 50 years in prison, which included a 25-year firearm enhancement. We affirmed the defendant's conviction on direct appeal. *People v. Smith*, 2021 IL App (2d) 191014-U (*Smith II*). The defendant brought a postconviction petition alleging inadequate assistance of trial and appellate counsel and due process violations under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Napue v. Illinois*, 360 U.S. 264 (1959); he also asserted actual

innocence, based on newly discovered evidence. The trial court dismissed the petition at the second stage of postconviction proceedings, and the defendant appealed. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3      As the facts are well known to the parties and set forth in detail in the defendant's direct appeals, we set forth only those facts relevant to this appeal. See *Smith I*, 2015 IL App (2d) 130663-U; *Smith II*, 2021 IL App (2d) 191014-U. The defendant shot Milliman on the evening of May 28, 2011. That night, Milliman came to the defendant's house to have sex with the defendant's wife, Kimberly Smith, [1] for money. The defendant, pretending to be Smith, communicated with Milliman via online instant messenger to schedule the encounter after Milliman responded to a Craigslist posting. When Milliman arrived at the defendant's house, he and Smith proceeded to a bedroom in the house to have sex. Shortly thereafter, Smith ended the encounter and left the bedroom.

¶ 4      According to the defendant, he was waiting out of sight in a different room. Shortly after Milliman arrived, he observed Smith and Milliman return to the front of the house. He moved to a room closer to the front to make sure Smith was safe. Smith and Milliman began to argue, and the defendant heard Smith say, "get your f*** hand off me" and then "baby, please help." The defendant, who was carrying a gun to protect his wife during the encounter, came around the corner and said, "[g]et your hands off my wife, get out of my house." The defendant could not see Smith because she was blocked by Milliman, who had her pinned up against the door. The defendant grabbed Milliman's shoulder with his free hand—his left hand—and also tried to grab Milliman's shirt with his right hand, which was holding the gun. The defendant said that Milliman pushed

_____

[1]For clarity, all later uses of "Smith" are in reference to Kimberly Smith.

back into him and his arm hit the wall, which caused the gun to discharge. The defendant testified that the discharge was accidental and he did not plan to kill Milliman.

¶ 5 The defendant further testified that he was scared after the gun discharged and he called 911. He told the dispatcher that someone broke into his house. He did not tell the dispatcher that someone was shot. After the 911 call, he ripped his computer out of the wall and threw it in the back room of the house, where it ended up under an unused washing machine that the defendant pushed over. The defendant then went outside, got in his truck and drove down the road, turned around and came back, and then parked his truck in front of the house. He told Smith to call him while he was driving to help make it look like somebody broke into the house. When the police arrived, he told them that he shot a man who was inside the house and directed them to the location of the gun. After the police investigated the crime scene, the defendant was brought to the police station.

¶ 6 In a video recorded interview with the police, which was entered into evidence and viewed by the trial court, the defendant said that he was on his way home when Smith called to tell him that there was someone in the house. He arrived home and entered the house with a gun that he kept in his vehicle. He saw a man pushing Smith against the door and told the man that he had a gun and that he would shoot if the man did not leave the house. After the man did not leave, he tried to grab the man's shirt, which ripped. He then put the gun against the man's back, his finger hit the trigger, and the gun went off. The defendant claimed the gun had a "really hairy, hairy trigger," meaning that it went off easily. The defendant admitted to shooting the man but felt that what he did was justified to protect his wife.

¶ 7 After a break in the interview, the defendant told the police that the break-in story was a lie. He then told the police that he had been home all night and that Milliman was at the house because of the Craigslist ad. The defendant told the police that he observed Milliman "all over"

Smith and warned Milliman that he had a gun. He stated that he had the gun on Milliman's back as he tried to pull Milliman off Smith. He acknowledged, however, that when he "pulled the trigger," Milliman was not striking Smith and did not have his hands around her neck. The defendant said that he and Smith were freaking out after the shooting and decided to stage the break-in. He again told the police that he believed his actions were justified because Smith's life was in jeopardy. He later also stated that he "didn't mean to shoot" but that he was "defending his wife." The defendant testified that he concocted the break-in story because of "everything that we were doing that was wrong, the indiscretions, the promiscuity."

¶ 8    Smith testified that, after she ended the sexual encounter, Milliman followed her to the front door and said he needed to use the bathroom. After using the bathroom, he came out and tried to hand her money because he "wanted to finish." She returned the money and asked him to leave. Smith said Milliman grabbed her left arm and tried to pull her back inside the house. He also slapped her face, but the slap "wasn't very hard at all." Smith asked Milliman to "get his hands off [her]," then the defendant came around the corner and told Milliman to get off Smith. Smith said that the gun went off immediately after the defendant told Milliman to get his hands off her. After the shooting, Smith said that the defendant asked her to get Milliman's phone from Milliman's car. After she gave Milliman's phone to the defendant, she stayed outside the house. She said that she heard the defendant smashing things inside the house. Smith eventually called 911 and told the dispatcher that the defendant shot a man who was sitting in her house when she came home. She admitted that what she said in the 911 call was a lie and that the defendant told her to lead the police to believe it was a break-in.

¶ 9    Also testifying at trial were two experts for the State, Julie Steele and Dr. Mark Witeck. Steele was a forensic scientist with the Illinois State Police. The court found her to be an expert in firearms identification. She was asked to examine the gun used by the defendant, for "trigger

pull"—the force required to release the sear of a firearm. Steele testified that her examination showed no evidence of a light trigger or a "hair trigger." She testified that it would take 4 pounds of pressure to discharge the weapon if the hammer was cocked and 12 pounds of pressure to discharge if it was not cocked.

¶ 10    Dr. Witeck was the forensic examiner who conducted the autopsy of Milliman. Dr. Witeck testified regarding his education as follows: "I went to undergrad out in California at Orange Coast College and University of California at Irvine. I went through medical school, finishing at the University Central del Este, or UCE, School of Medicine in the Dominican Republic." Dr. Witeck testified that after medical school he did a year of general internship at St. Luke's Hospital in Milwaukee, Wisconsin, followed by two years of anatomic pathology at the same hospital, and then two years of training in forensic pathology with the chief medical examiners for Wayne County, Michigan, and the State of Maryland. He testified that he was licensed to practice medicine in Wisconsin and Illinois and was board certified by the American College of Forensic Examiners and the American College of Forensic Medicine. Dr. Witeck stated that he had performed over 7000 autopsies and had testified at trial "many hundreds of times." Without objection, the court found Dr. Witeck to be an expert in forensic pathology.

¶ 11    Regarding Milliman's autopsy, Dr. Witeck testified that Milliman was 6 feet, 6 inches, tall and weighed 378 pounds. Dr. Witeck believed Milliman's cause of death was "a gunshot wound to the back." On cross-examination, Dr. Witeck testified that there was no evidence of "close-range firing," meaning that the gun was not fired within two feet of the victim. Dr. Witeck explained that he believed this because there was no evidence of stippling—tiny pinpoint abrasions or burns on the skin—nor was there any soot or gun powder on the skin. However, Dr. Witeck admitted that he examined only Milliman's skin and not the clothes Milliman was wearing.

¶ 12    The trial court found the defendant guilty of first degree murder. It observed that the defendant told three different stories—first that there was a break-in, then that it was self-defense, and, finally, that it was an accident. The trial court found that the defendant's testimony at trial was "simply not credible" and was contradicted by his own statements to the police, the testimony of the two expert witnesses, and the testimony of the other witnesses. It also found that the defendant was familiar with guns and, therefore, "most certainly knew that when you put a loaded gun into somebody's back and pull the trigger, that it was likely to cause death or great bodily harm." It also found that the defendant did not act in self-defense. The trial court noted that the defendant demonstrated to the police that Milliman had pinned Smith in the doorway by standing in front of her but found that there was no credible evidence that Milliman was physically hurting Smith. Thus, the trial court determined that the defendant's second-degree murder and involuntary manslaughter theories failed.

¶ 13    On October 25, 2022, the defendant filed his postconviction petition. In his petition, he alleged that his trial counsel was ineffective for seven reasons: (1) eliciting harmful testimony from Dr. Witeck on cross-examination regarding the lack of evidence of a close-range firing of the gun, (2) allowing the prosecution to misstate testimony during closing arguments and misstating the testimony himself, (3) failing to call one or more expert witnesses to rebut the State's two experts, (4) failing to object to the trial court not allowing the defendant to demonstrate his positioning at the time of the shooting, (5) convincing the defendant to waive his right to a jury trial based on a statement from the trial judge, (6) not fully investigating the credentials of Dr. Witeck, and (7) cumulative error. He also argued that his appellate counsel was ineffective for failing to raise those claims of ineffective assistance on direct appeal.

¶ 14    Additionally, the defendant alleged that he was denied due process under *Brady* and *Napue* because Dr. Witeck gave false or misleading testimony regarding his schooling and qualifications.

The defendant alleges that Dr. Witeck misled the trial court into believing that he had an undergraduate degree. He also alleges that Dr. Witeck lied about where he actually received his medical degree from, "School of Medicine—CETEC University Santo Domingo, Dominican Republic" (as listed on his CV), because the school was shut down based on degree-mill allegations.

¶ 15    Lastly, the defendant asserted that he was actually innocent of first degree murder, based on three new expert reports from Dr. Shiping Bao, Christopher Robinson, and Dr. Jack Hietpas. Dr. Bao, a licensed physician and forensic pathologist, reviewed Dr. Witeck's report and trial testimony, the laboratory report, and photographs of the entrance wound on Milliman's body. He concluded that "[t]he range of shooting cannot be decided by soot or stippling alone" and that, in his opinion, the entrance wound was consistent with a contact gunshot wound. Robinson, a forensic consultant and former director of the Atlanta Police Department's crime lab, reviewed the same information as Dr. Bao. He also concluded that the entrance wound was consistent with a contact gunshot wound. Robinson additionally opined that the gun may have been unintentionally discharged by striking an elbow on a wall or because of sympathetic contraction, where, when in a stressful situation, the body causes an individual to unknowingly squeeze whatever is in his or her hands. Robinson attached to his report several medical journal articles regarding sympathetic discharge. Dr. Heitpas, a senior research microscopist at Microtrace, LLC, also reviewed the same evidence. He concluded that the muzzle-to-target distance cannot be determined from the lack of gunshot residue alone. He believed that photographs of Milliman's clothes showed apparent unburnt or partially burnt propellant and potential soot, but that proper laboratory testing of the clothes was required.

¶ 16    At the second stage of postconviction proceedings, the State moved to dismiss the petition. The trial court granted the motion and dismissed all claims of the petition. The trial court found

that claims (1), (2), (3), (4), (6), and (7) of ineffective assistance failed because they all fell within the exercise of judgment, discretion, trial tactics, or strategy of trial counsel. Further, the trial court found that claim (5), regarding the waiver of a jury trial, did not amount to ineffective assistance because the record reflected a knowing, voluntary, and uncoerced waiver made without any promises or concessions, other than testimony being taken out of order during the bench trial. The trial court additionally found that there was no cumulative error because Illinois does not recognize the concept of cumulative error. The trial court further found that no *Brady* or *Napue* violation occurred, because the record did not support the argument that the State presented perjured or false testimony from Dr. Witeck and because the defendant failed to show that the result of the trial would have been different. Finally, the trial court found that the defendant's actual innocence claim failed because the "newly discovered" evidence was not new and the failure to proffer it at trial was the result of his trial counsel's trial strategy. The defendant then filed a timely notice of appeal.

¶ 17                                    II. ANALYSIS

¶ 18    The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2022)) provides a means by which a defendant may challenge his conviction or sentence for violations of federal or state constitutional rights. *People v. Whitfield*, 217 Ill. 2d 177, 183 (2005). The Act sets forth three stages of review. At the first stage, the trial court may summarily dismiss a postconviction petition as frivolous and patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2022). If the petition is not dismissed, it advances to the second stage.

¶ 19    At the second stage of postconviction proceedings, the State may move to dismiss a petition or an amended petition pending before the court. *Id.* § 122-5. If that motion is denied, or if no motion to dismiss is filed, the State must answer the petition. *Id.* At this stage, the trial court must determine whether the petition and the accompanying documentation make a " 'substantial showing of a constitutional violation.' " *People v. Domagala*, 2013 IL 113688, ¶ 33 (quoting

*People v. Edwards*, 197 Ill. 2d 239, 246 (2001)). If the petition satisfies this standard, the defendant is entitled to a third-stage evidentiary hearing at which the trial court acts as the fact finder and determines whether the evidence introduced demonstrates that the defendant is entitled to relief. *Id.* ¶ 34. We review *de novo* the dismissal of a postconviction petition at the second stage. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006).

¶ 20     In his postconviction petition and on appeal, the defendant argues (1) that he was denied due process under *Brady* and *Napue*, (2) that his trial and appellate counsel were ineffective, and, (3) based on newly discovered evidence, that he is actually innocent of first degree murder. We address each in turn.

¶ 21                         A. Due Process Violations

¶ 22     The defendant alleges that Dr. Witek's testimony regarding his schooling amounts to a due process violation under *Brady* and *Napue*. The defendant argues that Dr. Witeck committed perjury by not specifying that he did not have an undergraduate degree, misstating from where he received his medical degree, and not stating that his medical school was shut down because of allegations that it was a degree mill, *i.e.*, it was selling illegitimate medical degrees.

¶ 23     Under *Brady*, it is a violation of the right to due process for the State to fail to "disclose evidence that is favorable to the accused and 'material either to guilt or to punishment.' " *People v. Harris*, 206 Ill. 2d 293, 311 (2002) (quoting *Brady*, 373 U.S. at 87). To establish a claim under *Brady*, the defendant must allege that "(1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either willfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment." *People v. Beaman*, 229 Ill. 2d 56, 73-74 (2008). Additionally, it is a due process violation for the State to knowingly use false testimony or allow false testimony to go uncorrected, even if the false testimony goes solely to credibility. *Napue*, 360 U.S. at 269; *People*

*v. Jimerson*, 166 Ill. 2d 211, 223 (1995). A conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the verdict. *People v. Olinger*, 176 Ill. 2d 326, 345 (1997).

¶ 24    The standards concerning the qualification and admissibility of expert opinions help guide our analysis. Our supreme court has stated:

> "A person will be allowed to testify as an expert if his experience and qualifications afford him knowledge that is not common to laypersons, and where his testimony will aid the trier of fact in reaching its conclusions. [Citation.] 'There is no predetermined formula for how an expert acquires specialized knowledge or experience and the expert can gain such through practical experience, scientific study, education, training or research.' [Citation.] Thus, '[f]ormal academic training or specific degrees are not required to qualify a person as an expert; practical experience in a field may serve just as well to qualify him.' [Citation.] An expert need only have knowledge and experience beyond that of an average citizen. [Citation.] Expert testimony, then, is admissible 'if the proffered expert is qualified by knowledge, skill, experience, training, or education, and the testimony will assist the trier of fact in understanding the evidence.' [Citation.]" *Thompson v. Gordon*, 221 Ill. 2d 414, 428-29 (2006).

Additionally,

> " '[t]he trial court's gatekeeping function is to determine whether an individual is qualified to be an expert, not merely by determining whether that individual took an exam and can display a piece of paper showing a passing mark, but by reviewing the individual's credentials, experience, and knowledge of the subject matter.' " *Id.* at 422 (quoting *Thompson v. Gordon*, 356 Ill. App. 3d 447, 460 (2005)).

¶ 25    At issue in *Thompson* was whether an engineer must be licensed in Illinois to testify as an expert in a civil trial. *Id.* at 416. Based on the foregoing standards, our supreme court determined that one does not. *Id.* at 429. It reasoned that an expert's licensure is only one of the relevant factors to consider in determining whether an individual is an expert in a particular area. *Id.*

¶ 26    Here, we cannot say that the defendant's allegations regarding Dr. Witeck's testimony amount to a due process violation under *Brady* and *Napue*. The record shows that the defendant's trial counsel received Dr. Witeck's curriculum vitae (CV) prior to trial; thus, no information was withheld from the defendant in violation of *Brady*. Dr. Witeck's testimony was also not false. Dr. Witeck never testified that he had a four-year undergraduate degree, and his testimony does not so imply. His CV also does not list an undergraduate degree. Dr. Witeck testified consistently with his CV that he received his medical degree in the Dominican Republic. At worst, Dr. Witeck misstated the institution in the Dominican Republic from which he received his degree, but that does not, without more, amount to a due process violation under *Brady* and *Napue*.

¶ 27    Additionally, based on the standards and logic in *Thompson*, we do not believe that the defendant's arguments pertaining to the quality of Dr. Witeck's undergraduate and medical schooling substantially undermine his testimony, impeach his credibility, or establish a constitutional violation. Schooling is, of course, a factor to be considered when determining the admissibility and weight of an expert's testimony. But the perceived quality of that education is not reason to wholly discount that expert's opinion where, as here, the expert has acquired substantial experience in the subject matter following his medical school education, is licensed by the State, and is board certified in two relevant practice areas.

¶ 28    Dr. Witeck testified to this extensive postgraduate experience. He completed one year of general internship and two years of anatomic pathology at St. Luke's Hospital in Milwaukee; he spent two years training with the chief medical examiners in Wayne County, Michigan, and the

State of Maryland; he was licensed in Wisconsin and Illinois; and he was board certified by the American College of Forensic Examiners and the American College of Forensic Medicine. Dr. Witeck also testified that he had performed over 7000 autopsies and had testified at trial "[m]any hundreds of times." Thus, with this substantial relevant experience, any perceived deficiencies in Dr. Witeck's schooling do not impeach his credibility or undermine his testimony.

¶ 29    The defendant compares this case to *People v. Cornille*, 95 Ill. 2d 497 (1983). There, the defendant was convicted of arson after he allegedly damaged his home with the intent to defraud his insurance carrier. *Id.* at 500. At trial, experts for the State and the defense were divided as to how the fire started. *Id.* at 501. The State argued that the defendant started the fire with gasoline, while the defendant argued that it was caused by faulty wiring. *Id.* The State's key expert witness testified that he obtained two samples from the burned area of the home that he tested with special gas chromatography equipment that he invented. *Id.* at 503. He determined that the samples had traces of gasoline. *Id.* Based on this testing, all the State's experts concluded that the fire was probably caused by gasoline. *Id.* In his defense, the defendant presented substantial testimony in support of his theory of an electrical fire, including previous instances of faulty wiring. *Id.* An expert from the Illinois Bureau of Scientific Services testified that he tested samples for the presence of accelerants using a gas chromatography technique and determined that there was no presence of accelerants. *Id.*

¶ 30    Two years after the defendant's trial and conviction, the State's key expert gave an interview to a reporter where the expert admitted that he lied about his academic and professional credentials. *Id.* at 500. As a result, authorities investigated the expert and charged him with perjury for his false testimony in at least three criminal cases. *Id.* The defendant filed a petition for postconviction relief, arguing that he was denied due process because he was convicted based on the expert's false testimony. *Id.* at 499-500. Our supreme court determined that the State's use of

this expert's false testimony violated the defendant's right to due process. *Id.* at 514-15. It noted that the evidence was closely balanced and it was this expert who provided the crucial testimony that supported the defendant's conviction. *Id.*

¶ 31     Here, the allegations and evidence do not rise to the level of those in *Cornille*. As discussed, Dr. Witeck's testimony regarding his credentials was not false, unlike the expert's testimony in *Cornille*. Further, there is no allegation or evidence that Dr. Witeck's credentials are falsified. Dr. Witeck's testimony also was not the sole deciding factor in the defendant's conviction, as the evidence was not closely balanced. The defendant was deemed not credible in large part because of his shifting explanations and suspect actions following the shooting. Additionally, the defendant's trial counsel had adequate opportunity to cross-examine Dr. Witeck, where he elucidated the potential problems with Dr. Witeck's examination process and conclusions. For all these reasons, the defendant has failed to show that he was denied due process under *Brady* and *Napue*.

¶ 32                              B. Ineffective Assistance of Counsel

¶ 33     At the outset, we note that the defendant's ineffective assistance of trial counsel claims would ordinarily be forfeited because they were not raised on direct appeal. See *People v. Addison*, 2023 IL 127119, ¶ 23. However, our supreme court has made clear that, "[w]hen a petitioner is asserting claims that could have been raised on direct appeal, he can avoid the procedural bar of forfeiture by casting his claims as ineffective assistance of appellate counsel for failing to raise the issues on direct appeal." *Id.* (citing *People v. Turner*, 187 Ill. 2d 406, 413 (1999)). A defendant who alleges that appellate counsel rendered ineffective assistance must show that appellate counsel's failure to raise an issue was objectively unreasonable and prejudiced the defendant. *People v. Simms*, 192 Ill. 2d 348, 362 (2000). The prejudice inquiry requires that the reviewing court examine the merits of the underlying issue because a defendant cannot suffer prejudice from

appellate counsel's failure to raise a nonmeritorious claim on appeal. *Id.* Thus, we begin by determining whether trial counsel's performance was deficient.

¶ 34 Under *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant arguing ineffective assistance of counsel must show not only that his or her counsel's performance was deficient but also that the defendant suffered prejudice as a result. *People v. Houston*, 226 Ill. 2d 135, 143 (2007). Specifically, under the two-prong *Strickland* test, "a defendant must show that (1) his counsel's performance *** fell below an objective standard of reasonableness, and (2) *** but for counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different." *Id.* at 144. Because a defendant must satisfy both prongs of the *Strickland* test, the failure to establish either is fatal to the claim. See *Strickland*, 466 U.S. at 687.

¶ 35 There is a strong presumption that counsel's actions or inactions—such as the decision not to present certain arguments or not to call witnesses—constitute sound strategy. *People v. Perry*, 224 Ill. 2d 312, 341-42 (2007). To prove otherwise, a party must show that counsel's decision was so irrational and unreasonable that no reasonably effective attorney, facing like circumstances, would pursue such a strategy. *People v. Jones*, 2012 IL App (2d) 110346, ¶ 82.

¶ 36 On appeal, the defendant raises six claims of ineffective assistance of trial counsel: (1) eliciting damaging testimony from Dr. Witeck, (2) failing to call expert witnesses, (3) failing to object to the trial court denying the defendant's demonstration of his positioning during the shooting, (4) convincing the defendant to take a bench trial, (5) failing to investigate Dr. Witeck's schooling, and (6) cumulative error. We begin with the three arguments related to the expert witnesses.

¶ 37 The defendant alleges that his trial counsel was deficient because Dr. Witeck testified for the first time during cross-examination that there was no evidence of a close-range firing, which the defendant claims undermined his theories of the case. Similarly, the defendant argues that his

trial counsel did not fully investigate Dr. Witeck, which would have revealed the alleged issues with Dr. Witeck's schooling. The defendant also claims that his trial counsel was deficient for not calling any expert witnesses to rebut the opinions of Dr. Witeck and Steele. The defendant argues that, had his counsel investigated Dr. Witeck and called rebuttal experts, he could have disproven the experts' testimony, undermined their credibility, and bolstered his own credibility.

¶ 38     The defendant fails to show any prejudice from these actions, and thus, these claims fail the second prong of *Strickland*. For the reasons previously discussed, there was no prejudice from his trial counsel's failure to raise any issues with Dr. Witeck's schooling. The defendant's trial counsel also repeatedly attacked Dr. Witeck's credibility during cross-examination by challenging the process and conclusions of Dr. Witeck's autopsy report. For example, the cross-examination reveals that Dr. Witeck tested only Milliman's skin for soot and gunshot residue, and not Milliman's clothes, where soot or gunshot residue may have been located. It also revealed that Milliman had surgery before he died and Dr. Witeck performed the autopsy, so Milliman's skin would have been cleaned prior to Dr. Witeck's examination. Further, the defendant's credibility did not fully hinge upon the credibility of Dr. Witeck. Both the trial court and this court on direct appeal noted that the defendant's ever-changing stories undermined his credibility. See *Smith II*, 2021 IL App (2d) 191014-U, ¶ 69. Moreover, the trial court found that, even with Dr. Witeck's testimony regarding the shooting distance, the defendant "most certainly knew that when you put a loaded gun *into somebody's back* and pull the trigger, that it was likely to cause death or great bodily harm." (Emphasis added.)

¶ 39     The defendant also fails to show prejudice from trial counsel's failure to rebut Steele's testimony regarding the trigger pull. Indeed, the defendant does not now offer the opinion of an expert that challenges Steele's testimony that the gun required either 4 or 12 pounds of force to discharge or supports his claim of a "hairy" trigger. While the defendant offers an expert's report

regarding the instances under which a firearm might be accidentally discharged, this does not negate the finding that the defendant's actions after the shooting were not consistent with someone who accidentally killed a person. See *id.* ¶ 55 ("That defendant deliberately pulled the trigger on the gun is also supported by his actions following the shooting."). Thus, the defendant has failed to show that he was prejudiced by his trial counsel's actions related to the expert witnesses.

¶ 40    The defendant next claims that trial counsel was deficient by failing to object when the trial court prevented the defendant from demonstrating his positioning during the shooting. The defendant maintains that it was imperative that he demonstrate off the witness stand to allow the trial court to adequately see his perspective of the incident and correct his errors when speaking with police.

¶ 41    While on the witness stand, the defendant explained and demonstrated his version of the shooting:

> "[DEFENSE ATTORNEY]: What did you do next?
>
> A. I screamed, I yelled to get out of my house. And I ran up to grab him by his shirt. All I intended to do was to grab him by his shirt.
>
> Q. You're holding a gun.
>
> A. I wasn't thinking.
>
> Q. Explain how you're holding him—grab him holding a gun.
>
> A. I ran up to grab him. I didn't even think. I just ran up to grab him.
>
> Q. That gun's fairly small.
>
> A. Yes.
>
> Q. How big are your hands. Hold them up. Large hands.
>
> A. Yes.
>
> Q. Were you able to hold that gun with a couple fingers and still try to grab things?

A. Yes.

Q. Explain for the judge how you try to grab him.

A. Can I show you.

Q. Explain it first and then we'll talk about—

A. So I ran up to grab him and I put a hand on his shoulder, the free hand, and I had the gun and I used kind of like—I just—it wasn't even more of a grab, it was just as soon as I tried to pull him with this hand.

Q. And what happened?

A. He pushed back and when he pushed back that's when my arm hit the wall. There was this much room.

Q. So you're saying that you go to grab him and now his weight sort of comes back and you're in this hallway?

A. Yes.

Q. All right. And which direction do you go?

A. Kind of back and against the wall, like when I grabbed him with my left hand is when he jumped—either he pushed or jumped back.

Q. You know, you're demonstrating like that and you've got a left hand kind of up on a shoulder or what would be a shoulder.

A. Yeah.

Q. And a right-hand sort of to the side.

A. Yes.

Q. Is that accurate how you tried to grab him?

A. Yes.

Q. And as you're kind of pushed back into the wall, what happens?

A. The gun just accidently went off.

Q. Were you trying to kill him?

A. No.

Q. How many times did the gun go off?

A. Once.

MR. HAIDUK [(DEFENSE ATTORNEY)]: Judge, I would ask if the Court would allow [the defendant] to step down and demonstrate this.

THE COURT: He doesn't need to. I got it, Mr. Haiduk.

MR. HAIDUK: Thank you, Judge."

Previously, during his recorded police interview, the defendant demonstrated to the police his positioning, which aligns with this testimony, except that the defendant testified that he held the gun with his left hand.

¶ 42    The admissibility of courtroom demonstrations is discretionary. *People v. Harp*, 193 Ill. App. 3d 838, 843 (1990). The purpose is to aid the fact finder in understanding the testimony. *Id.* On direct appeal, decisions regarding admissibility of demonstrations will not be reversed unless the trial court abused its discretion to the prejudice of the defendant. *Id.*

¶ 43    Here, the defendant adequately explained his actions to the trial court, with demonstrations both on the witness stand and in his recorded police interview. The trial court understood the defendant's testimony and made the determination that it did not need any further demonstration. Thus, it was not abuse of discretion for the trial court to deny the demonstration, and therefore, trial counsel was not deficient for failing to object. See *People v. Edwards*, 195 Ill. 2d 142, 165 (2001) ("Counsel cannot be considered ineffective for failing to make or pursue what would have been a meritless objection.").

¶ 44    The defendant's reliance on *People v. White*, 2017 IL App (1st) 142358, is unpersuasive. In *White*, after a bench trial, the defendant was convicted of delivery of a controlled substance. *Id.* ¶ 1. During an undercover operation, a police officer purchased a white powdery substance from a person wearing a white tank top in an alleyway. *Id.* ¶ 2. The officer later identified that person as the defendant, from a photo array. *Id.* ¶ 5. The defendant argued that the police officers involved misidentified him because the they did not note in their reports that the offender had any tattoos, but the defendant had several visible tattoos on both his arms. *Id.* ¶¶ 7-8. At trial, the defendant's attorney asked to show the trial court the defendant's tattoos as they would have been seen from the perspective of the officer participating in the purchase. *Id.* ¶ 8. The trial court did not allow the demonstration but noted for the record that, from the trial court's view of the defendant on the witness stand, the defendant had a tattoo on his right forearm that was visible with his hand facing up, but not visible with his hand facing down. *Id.* ¶¶ 8-9. The defendant's trial attorney repeatedly objected, noting that the trial court did not view the tattoo from the same vantage point as the officer. *Id.* ¶¶ 9-10.

¶ 45    The defendant appealed his conviction, arguing that the trial court erred by not allowing him to properly demonstrate his tattoos. *Id.* ¶ 25. The appellate court agreed and vacated the defendant's conviction. *Id.* ¶ 44. The reviewing court noted that the defendant's

> "theory at trial was that he was misidentified. His best evidence was that neither police officer had described the drug dealer as having tattoos when they observed him during the drug transaction, when in fact defendant had tattoos on both arms. In more than one way, the trial court prevented defendant from presenting this defense." *Id.* ¶ 26.

Additionally, "[e]vidence that defendant's tattoos would have been visible to [the police] at the time of the drug transaction was unquestionably probative and relevant to the credibility of the officers' identifications of defendant as the drug dealer in question." *Id.* ¶ 27. "[T]he trial court

decided that its own view of defendant's right forearm, when turned palm down, from its vantage point on the bench 'about two feet above' defendant, was all the court needed to know—that when defendant's palm was turned down, the tattoo on the right forearm was not visible." *Id.* ¶ 28. Thus, the trial court "erred in substituting its own view of defendant's right arm, under *not* substantially similar conditions, in lieu of this relevant testimony." (Emphasis in original.) *Id.*

¶ 46    Here, however, the defendant's testimony, demonstrations on the witness stand, and video recorded demonstration to police made clear to the trial court his version of the events. The defendant's testimony did not rely on a particular vantage point, and the trial court did not substitute its own view for that of another. No further demonstrative evidence could have made the defendant's testimony clearer for the trial court or the record. Thus, the defendant's trial counsel was not ineffective for failing to object.

¶ 47    Next, the defendant alleges that his trial counsel was ineffective by convincing the defendant to waive his right to a jury trial and proceed with a bench trial. The defendant says that, on the morning of his trial, his trial counsel talked to him about the possibility of a bench trial. After some discussion, the defendant informed his trial counsel that he still wanted a jury trial. The defendant alleges that his trial counsel then told him, "during a[n] [Illinois Supreme Court Rule 402 (eff. July 1, 2012)] conference, [the trial court] said to [counsel], 'I don't think he meant to shoot this guy,' " an apparent reference to the defendant's argument that the shooting was accidental. Based on this statement, the defendant agreed to a bench trial. The defendant claims that, but for this "promise" from his trial counsel, he would never have waived his right to a jury trial.

¶ 48    In support of his argument, the defendant relies on *People v. Smith*, 326 Ill. App. 3d 831 (2001). In *Smith*, after a bench trial, the defendant was convicted of first degree murder. *Id.* at 836. In the defendant's postconviction petition, he alleged that his trial counsel induced him to waive

his right to a jury trial because "the judge owed trial counsel a favor and the judge would have information not available to a jury." *Id.* at 847. The appellate court reversed the dismissal of the postconviction petition at the first stage, based on the insinuation of unethical judicial conduct. *Id.* at 855-56.

¶ 49 Here, the defendant's reliance on *Smith* is inapposite. There is no indication of any promise by his trial counsel, suggestion that the trial court would definitively find the defendant not guilty or guilty of lesser charges, or insinuation of unethical judicial conduct. There is no other allegation or evidence that the defendant's trial counsel otherwise coerced him into waiving his right to a jury trial.

¶ 50 Instead, this case is more like *People v. Hobson*, 386 Ill. App. 3d 221 (2008). In *Hobson*, the defendant filed a postconviction petition alleging that his trial counsel coerced him into waiving his right to a jury trial by stating that the trial judge " 'would find [the defendant] not guilty if [he] took a bench trial, that [his trial counsel] knew the judge and the judge was alright.' " *Id.* at 242. The appellate court affirmed the dismissal of the postconviction petition, holding that the defendant's trial counsel did not cross the "suggestion" line and "merely indicated to defendant that his chances of acquittal were better with a bench than a jury trial." *Id.* at 245.

¶ 51 Here, too, the statement by the defendant's trial counsel did not cross the "suggestion" line and merely indicated his strategic belief that a bench trial gave the defendant a better chance at acquittal or conviction of lesser charges. There was no promise by the defendant's trial counsel that he would be acquitted or found guilty of lesser charges. Thus, trial counsel's conduct was not deficient.

¶ 52 Finally, the defendant argues that even if none of the above actions by his trial counsel was deficient on its own, the cumulative effect of those actions amounts to ineffective assistance. Before discussing the merits of this argument, we note an issue with the trial court's ruling on this

argument. The State argued, and the trial court found, that our supreme court "does not recognize the concept of cumulative error," citing *People v. Albanese*, 104 Ill. 2d 504, 524 (1984). However, the discussion of cumulative error in *Albanese* is not related to ineffective assistance of counsel claims. The discussion, which was directed at "the allegations of error previously examined," directly precedes the discussion of ineffective assistance of counsel claims and is related to violations of the sixth amendment right to an impartial jury under *Witherspoon v. Illinois*, 391 U.S. 510 (1968). *Albanese*, 104 Ill. 2d at 524. In that discussion, our supreme court did not refuse to recognize the concept of cumulative error but found that there was no cumulative error under the facts of the case. *Id.* Indeed, appellate courts have recognized claims for ineffective assistance of counsel based on cumulative error. See, *e.g.*, *People v. Vera*, 277 Ill. App. 3d 130, 141 (1995) ("Although any one error of counsel, by itself, may not have satisfied the two-prong test established in *Strickland*, 'cumulatively, counsel's failures render the result of the proceedings "unreliable under the standard enunciated in *Strickland.*" ' [*People v. Garza*, 180 Ill. App. 3d 263, 270 (1989) (quoting *People v. Solomon*, 158 Ill. App. 3d 432, 437 (1987)).]").

¶ 53    Nevertheless, the defendant's claims here fail to show, individually or cumulatively, that he suffered prejudice from his trial counsel's alleged deficiencies. Thus, the defendant's claim of ineffective assistance of trial counsel based on cumulative error fails. By extension, his claims of ineffective assistance of appellate counsel also fail.

¶ 54                                C. Actual Innocence

¶ 55    Finally, the defendant argues that he is actually innocent of first degree murder, based on "newly discovered" evidence. The "newly discovered" evidence is the reports of Dr. Bao, Robinson, and Dr. Hietpas, which the defendant maintains rebut the opinions of Dr. Witeck and Steele. The State argues that these opinions are not "newly discovered" and cannot support a claim of actual innocence. We agree.

¶ 56 Establishing a claim of actual innocence "is extraordinarily difficult." *People v. Coleman*, 2013 IL 113307, ¶ 94. To succeed on an actual innocence claim, "the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial." *People v. Robinson*, 2020 IL 123849, ¶ 47. "Newly discovered evidence is evidence that was discovered after trial and that the [defendant] could not have discovered earlier through the exercise of due diligence." *Id.* "Evidence is material if it is relevant and probative of the [defendant's] innocence." *Id.* "Noncumulative evidence adds to the information that the fact finder heard at trial." *Id.* "[T]he conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result." *Id.*

¶ 57 Here, the defendant's actual innocence argument fails at least two of the elements needed to establish an actual innocence claim. First, the affidavits from Dr. Bao, Robinson, and Dr. Hietpas are not newly discovered. They are based on evidence and information that was available at the time of trial. See *id.* ¶ 53 (finding affidavit of the defendant was not "newly discovered" evidence because it was based on information available before trial). The defendant's trial counsel made the strategic decision not to call any expert witnesses. See *People v. Hamilton*, 361 Ill. App. 3d 836, 848 (2005) (noting that the decision not to call an expert witness is a matter of trial strategy). Second, the defendant fails to show that consideration of this evidence, along with the trial evidence, would "probably lead to a different result." *Robinson*, 2020 IL 123849, ¶ 47. As discussed, the evidence of the defendant's guilt was overwhelming and was primarily based on his lack of credibility. See *Smith II*, 2021 IL App (2d) 191014-U, ¶ 55. Thus, the defendant failed to state an actual innocence claim.

¶ 58                                III. CONCLUSION

¶ 59 For the reasons stated, the judgment of the circuit court of McHenry County is affirmed.

¶ 60      Affirmed.

*People v. Smith*, **2024 IL App (2d) 230539**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of McHenry County, No. 11-CF-520; the Hon. James S. Cowlin, Judge, presiding. |
| **Attorneys for Appellant:** | Richard Dvorak, of Dvorak Law Offices, LLC, of Clarendon Hills, for appellant. |
| **Attorneys for Appellee:** | Patrick D. Kenneally, State's Attorney, of Woodstock (Patrick Delfino, Edward R. Psenicka, and Ivan O. Taylor Jr., of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |