2025 IL App (1st) 240712-U

FIRST DIVISION
September 22, 2025

No. 1-24-0712

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 09 CR 16351 |
| | ) | |
| DEMETRIUS DILLON, | ) | Honorable |
| | ) | Laura Ayala-Gonzalez, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

ORDER

¶ 1    *Held*:   We affirm the judgment of the circuit court of Cook County denying defendant's petition for postconviction relief after a third-stage evidentiary hearing; trial counsel did not render ineffective assistance by not using a peremptory challenge to exclude a juror; any error by the trial court when it barred a witness from testifying as a discovery sanction was harmless beyond a reasonable doubt because the verdict would not have been different had the evidence been admitted.

¶ 2    The State indicted defendant, Demetrius Dillon, along with Tramaine Shorty and Kenneth Thomas, on multiple counts of aggravated criminal sexual assault. Their cases were severed; neither Shorty nor Thomas is a party to this appeal. The indictments alleged that each defendant committed an act or acts of sexual penetration against the victim, L.H. Following a jury trial, the circuit court of Cook County convicted defendant of four counts of aggravated criminal sexual assault; one conviction was based on defendant's own act of penetration and

three convictions were based on acts of penetration by Shorty and Thomas on a theory of accountability. The court sentenced defendant to an aggregate 36-year term of imprisonment.

¶ 3 Defendant filed a petition for postconviction relief. Following an evidentiary hearing, the postconviction court denied defendant's petition. For the following reasons, we affirm.

¶ 4                                    BACKGROUND

¶ 5 For the sake of clarity and conciseness, we will confine the summation of the history of this case to those matters necessary to provide context and that have a direct bearing on the issues we are deciding. We summarized the evidence leading to defendant's conviction in defendant's direct appeal. See *People v. Dillon*, 2015 IL App (1st) 131017-U (*Dillon I*).

¶ 6 Before questioning potential jurors in this case, the trial court stated that it had been given a witness list and asked defendant's trial counsel whether there were any names of any witnesses not on the list that trial counsel wanted read to the jury. Trial counsel responded he would give the court a copy of defendant's answer to discovery. Trial counsel identified three additional witnesses that did not include the name Jaquita Moman. Trial counsel informed the court, "That's it." The court asked defendant if there were any other witnesses defendant wanted his lawyer to list, and defendant responded there was, but defendant could not remember the name. Trial counsel stated he did not know the full name of the person defendant was talking about but counsel would talk to defendant about it and, "If I can get if from him, I will amend it, ask to amend it and put this person on there." The parties discussed other matters pertaining to the trial and later the court asked trial counsel about the other witness defendant mentioned. Trial counsel informed the court counsel and defendant "conferred on that. We will not be adding that name to the list of witnesses." The trial court asked and defendant responded that defendant was in agreement with trial counsel. The parties then proceeded with jury selection.

¶ 7    When questioning the potential jurors, the trial court asked, "Is there anything about the nature of the charge that would prevent anyone from giving both sides a fair and impartial trial in this case." Multiple potential jurors raised their hand and were later excused for cause or by peremptory challenge. One potential juror, who is at issue in this case, informed the court, "My daughter was, we think she was raped in college, about ten years ago." No further questioning occurred at that time. The trial court denied trial counsel's request to remove that potential juror for cause and allowed that potential juror, among others, to be interviewed. During the interview of the potential juror at issue, he informed the trial court that ten years ago his daughter told him that she was raped at college, and related that she had to be put into counseling. No one was ever charged with the offense. The following colloquy occurred:

"Q. [THE COURT]: Okay. Earlier when I asked the group if there was anything about the nature of the charge that would affect your ability to be fair and impartial, you mentioned that [(the rape)] as well, correct?

A. [THE JUROR]: Yes.

Q. Do you think you can put that to the side and decide the case, this case on the evidence that you see and hear in this courtroom and the law as it applies to the evidence?

A. Yes.

* * *

Q. Other than what we discussed about your daughter's experiences, is there anything about the nature of the charge that would affect your ability to be fair and impartial?

A. No. Except that I have airline tickets Friday. I mean, if I have to bring it up, I mean.

* * *

Q. Would you use sympathy, bias or prejudice in reaching your decision?

A. No.

Q. Will you wait for all the evidence, arguments of the attorneys, and my instructions of the law before making up your mind?

A. Yes.

Q. Would you follow the law as I give it to you even if you might personally disagree with it?

A. Yes.

Q. And will you consider the evidence in light of your own observations and experiences in life and use your common sense?

A. Yes.

Q. If after you hear everything, you believe the State has proved its case beyond a reasonable doubt, will you sign a guilty verdict?

A. Yes.

Q. On the other hand, if after hearing everything you do not believe the State has proved its case beyond a reasonable doubt, will you sign a not guilty verdict?

A. Yes.

Q. And will you be fair to both sides?

A. Yes.

> Q. Is there anything I have not asked you about that would affect your ability to be fair?

> A. No. You got everything."

¶ 8    Defendant's trial counsel accepted the juror at issue.

¶ 9    The victim, L.H., testified that she encountered Shorty and Thomas on the street and they all went to an abandoned building where they sat talking on the porch. *Dillon I*, 2015 IL App (1st) 131017-U, ¶¶ 4-5. L.H. testified that during that conversation defendant approached the fence and spoke to Shorty. *Id.* ¶ 5. Defendant left, and L.H., Shorty, and Thomas went to a vacant second-floor apartment in the building. *Id.* ¶ 6. Shorty left to purchase alcohol and when Shorty returned, both Shorty and Thomas committed nonconsensual acts of sexual penetration against L.H. *Id.* ¶¶ 6-7. L.H. testified there was a knock at the door and Thomas admitted defendant to the apartment. *Id.* ¶ 8. L.H. testified that after defendant's arrival, Thomas and defendant committed further nonconsensual acts of sexual penetration against L.H. *Id.* ¶ 8. Shortly thereafter, several police officers arrived and arrested all three men. *Id.* ¶ 8.

¶ 10    A prosecution witness, Angelique Covington, testified that she had seen three men, one being defendant, on the street. The two other men crossed the street and entered the building. Covington testified that later, defendant also entered the building. Covington testified that ten to fifteen minutes later, after all three men had entered the building, Covington started hearing a female crying and what sounded like someone being beaten in a gangway. *Id.* ¶ 10. Covington called the police; and while she waited, Covington heard a female crying from the second floor of the building. *Id.*

¶ 11    Covington's 9-1-1 call was played in open court. On it, Covington says that there are "about three or four guys raping this little young girl in this abandoned house," "[i]t's about three

or four guys. You can hear them, beating on a girl. Telling her to suck their thing. At first they were in the gangway. Now they done made her go up inside the abandoned building."

¶ 12    Chicago Police Department Officer Robert Roth testified that he and his two partners made entry to the building and proceeded to the second floor. Roth entered the second-floor apartment and saw who he learned was Shorty run to Roth's left toward the rear of the apartment. Roth proceeded to his right and saw who he learned was Thomas "on the couch, he was laid back sprawled out with his pants down." Roth proceeded around "a small like partition wall" where he testified that he saw the victim "and then I also saw [defendant] standing behind her." Roth testified, "At that time he [*sic*] jeans that were down past his—he had his pants down, I can't remember what kind of shirt he was wearing at the time." The State asked what defendant was doing with regard to his pants and Roth stated that defendant "was trying to pull them up." At that time the victim was "naked from the waist down, she had some type of top on \*\*\*." The victim was visibly upset and told Roth she had been raped.

¶ 13    A former forensic DNA analyst for the Illinois State Police testified that defendant could not be excluded as the donor of several DNA samples she tested. The witness analyzed DNA samples from a condom identified as lab exhibit 6. The witness extracted DNA from both inside and outside the condom and got non-sperm, sperm, and mixed DNA fractions. The non-sperm fraction from the inside of exhibit 6 matched the Y-STR DNA haplotype of defendant. That haplotype would occur in 1 in 1,500 unrelated African-American males. The sperm fraction from inside the condom labeled lab exhibit 6 contained a mixture of DNA from two males with a major and a minor donor of the DNA. The DNA of the major donor matched defendant. That haplotype would be expected to occur in approximately 1 out of 1,500 unrelated African-American males. Defendant could not be excluded as a contributor to the non-sperm fraction on

the outside of exhibit 6, which was a mixture of three males. In sum, the witness testified that "[t]here is an association to [defendant] for all three of the fractions that [*sic*] both the inside and outside of that condom [(exhibit 6).]"

¶ 14    The defense called Chicago Police Department Officer James Delise as a witness. Delise responded to the 9-1-1 call to the building with Officer Roth. Delise testified, in relevant part, that he observed three people in the building. Officer Delise "saw one sitting on a couch with his pants down. I saw one standing next to the victim with his pants down, and I saw run [*sic*] running."

¶ 15    On the second day of trial, defendant's trial counsel indicated to the trial court that defendant was about to testify. The court asked trial counsel whether trial counsel was "going to have any other witnesses when we return from lunch other than [defendant.]" Trial counsel responded he may want to recall the victim to lay a foundation for impeachment. The court noted that counsel had already had "ample opportunity to cross-examine" and offered trial counsel the opportunity to make an offer of proof. Counsel responded he had "to investigate something else" and offered to make the offer of proof after lunch.

¶ 16    When proceedings resumed, trial counsel informed the trial court they had been trying for several months to locate a witness named Jaquita Momon, "whose name was mentioned in this trial." Counsel stated, "We were able to locate last night Miss Momon. We were able to put a subpoena on Miss Momon. We were able to interview Miss Momon, and we have Miss Momon in the courthouse." Trial counsel informed the court that the victim had been living with Momon at the time of the incident and they were best friends. Trial counsel informed the court that after the victim got out of the hospital, the victim told Momon "there was no rape," the victim "willingly had sex with Tramaine Shorty and willingly had sex with *** Thomas, and that at no

point and time did she have sex with this defendant." Trial counsel asked to call Momon as a witness.

¶ 17　The State objected, noting that the case had been pending for two years, the State received supplemental answers to discovery twice, and at no time was Momon listed as a witness. The State informed the trial court it had not had an opportunity to speak with Momon, and defendant's trial counsel stated "we will provide her to the State. We just now got in touch with her ourselves." When asked why trial counsel had not listed Momon in discovery, counsel stated it was because "we had no address for this woman. We were told to go to this place, and this place, and this place. We finally ended up finding her at [an address on] Van Buren." The State replied, "those are the addresses listed in all the police reports for Jaquita Momon, which were given to counsel two years ago when this case came in."

¶ 18　The trial court asked, "So you had her served last night?" and trial counsel responded they did. The court asked if trial counsel informed the State that morning and counsel stated he did not because "we didn't know if we were going to get her here or not." Counsel stated Momon had refused to come to court "and now we were able to get her here." The court denied defendant's request to call Momon as a witness stating, "violation of discovery, you knew about her last night, never told the State about her until today, until the very last moment. It's not trial by ambush." The trial court denied the request to call Momon as a witness "as sanction for your discovery violation." The court denied trial counsel's oral motion to reconsider.

¶ 19　The case proceeded with defendant's testimony. Defendant testified at trial that around 11:00 p.m. on the date of the offense he went to the building because a lot of defendant's friends were always "hanging out in this house." No one was on the porch and defendant went to the second floor because that is where his friends hung out. Defendant denied that he was touching

himself when he entered the second-floor apartment. Defendant went to the second-floor apartment expecting to find his friends, and when Shorty opened the door defendant saw Thomas and the victim, and the victim was "half-dressed." Defendant testified that within one minute, police arrived. Defendant denied saying anything to, touching, or having sex with the victim. Defendant testified that when police entered, defendant was standing on the right side of the entry door. Defendant denied he was standing by the woman. Defendant testified that he was wearing blue and red baggy jeans. When asked, "What do you mean by baggy?" defendant testified, "the jeans were "big on him" and defendant did not have the jeans up around his waist; rather, the jeans had "a little sag" and when defendant sags his jeans, his underwear is showing, "[a] little bit, like the top" of the underwear. Defendant denied telling police he saw Shorty on the porch with the victim earlier that day.

¶ 20    In rebuttal, the State called the detective who spoke to defendant after police arrested defendant. The detective testified that defendant told her that Thomas opened the door to the apartment and defendant saw Shorty and the victim engaging in oral sex, that defendant saw "Thomas buttoning up his pants and sat down on the couch," that defendant heard the victim say, "you can't do it like this" to Thomas, and that defendant saw the victim and Shorty on the porch together earlier. The detective also testified that defendant told the detective that when the police came into the room, defendant's pants were up and not down.

¶ 21    Trial counsel informed the trial court that the defense would not have a surrebuttal but again asked to call Moman as a witness. The trial court denied defendant's request. As stated above, the jury found defendant guilty.

¶ 22    Defendant filed a motion for acquittal notwithstanding the verdict or a new trial. Defendant's motion argued, in relevant part, that the trial court "erred when it denied the defense

the opportunity to call as a witness discovered during trial, Jaquita Moman, as either a witness during the defense's case-in-chief or as a rebuttal witness."

¶ 23    Moman testified at an evidentiary hearing on defendant's posttrial motion. Moman testified that she is aware of defendant but does not know him personally. Moman and the victim grew up together in Sterling, Illinois, and the victim came to live with Moman when Moman was living with Moman's grandmother on Van Buren in Chicago. Moman testified she was with the victim on the day of the offense at Moman's residence and they left to go to Jackson Street. It was later revealed that they went to the home of Moman's boyfriend. At approximately 7:00 p.m., the victim left to go to a store and Moman remained on Jackson. The victim went in the opposite direction from the store and turned down another street. The next time Moman saw the victim was the following morning at the Van Buren address. The victim told Moman that she (the victim) had just come from the hospital. The victim told Moman's grandmother she had been raped; however, Moman testified the victim "looked at me with, like, a laugh on her face, a little smile, and after that, we went in [Moman's] room and we started talking about it."

¶ 24    Moman testified that at first, the victim told Moman that the victim walked up to two boys, they put a gun to the victim's head and forced her into a car, then they drove the victim to an apartment where they forced her to engage in sex acts with them. The victim did not say where she was taken, only that it was an abandoned building. Moman testified that the same day, they went back to Jackson Street, and the victim then told Moman a second story. Moman testified that her boyfriend brought it up, and the victim "was saying how she was –that she didn't get raped, she was—that they didn't force her to get in no car with a gun, they didn't have a gun. She walked off with some boys to go get some alcohol from the store. She said she walked off with two boys to go get alcohol ***." Moman further testified that the victim "said

she made up some parts because she didn't want me and the person who I was with to keep making fun of her for just going off with random boys that she didn't know, that she didn't mean for it to go this far ***." Moman testified that after the first offender went to trial, the victim sent a text message or messages to Moman telling Moman that the victim "was going to come to court and tell them what really happened. She [(the victim)] didn't mean for none of this to even get this far. She made it up. *** She just kept letting me know that she didn't mean for none of this to go this far." Moman testified that the victim told Moman that there was no rape several times. When asked about two boys having sex with her and a third boy coming to the location, Moman testified, "she said it was—she said she had sex with two boys, and she gave one of them oral, but the last person who walked in, he just walked in about five minutes before the police came in, and she said she didn't touch him at all, or he didn't touch her."

¶ 25    On cross-examination, Moman testified that her boyfriend arranged a phone call between the victim and Shorty while Shorty was in jail. Moman testified that Shorty's girlfriend had contacted Moman through Facebook and began the process of facilitating the phone call. Moman testified that she did not start telling what happened, about the victim saying there had been no rape, until the victim made a statement and "dragged me and [her boyfriend] in this, and when she [(the victim)] told them my name, that's when I start telling them what happened."

¶ 26    Moman testified that after she came to court to testify but was not allowed, she spoke to an investigator and provided the same information Moman testified to at the hearing to the investigator. When asked, Moman agreed that when Moman spoke to the investigator, Moman would look to her boyfriend "to see if [she] could answer," but Moman explained it was "[n]ot to see if I should answer, but *** if I [should] tell how she [(the victim)] was getting around and that stuff." Upon redirect examination Moman further explained the reasons Moman was looking

to her boyfriend when Moman spoke to the State's investigator was "[b]ecause I didn't know if I should tell, like, how she [(the victim)] was when she first came to Chicago, or her history, how she got down, stuff like that, and just the personal information." Moman told the investigator she would meet with people from the Cook County State's Attorney's Office (CCSAO) and show them the text messages confirming that Moman was telling the truth. The investigator phoned Moman to arrange a time to meet with the CCSAO but when the investigator identified who he was, Moman hung up. After that, Moman stopped answering the investigator's calls and never returned any of his messages. Moman agreed she never provided the text messages to the CCSAO and said it was because she could not find the SIM card.

¶ 27    On redirect, defendant's trial counsel asked Moman about text messages and Facebook messages relative to the victim. Trial counsel asked if the defense had asked Moman for the Facebook information and Moman agreed she was unable to locate that information. Moman testified, "Yes. I guess, by her [(the victim)] blocking me, I can't see nothing that we discussed or I can't go on her page or nothing now." Moman also testified that she was not able to provide the text message information to the defense.

¶ 28    Upon questioning by the trial court, Moman testified that, although Shorty's girlfriend asked Moman to come to court to testify, she did not, and when asked why, Moman testified, "I don't know. I just didn't come [to court.]" The court asked Moman for the phone number of the phone the victim allegedly texted to with Moman. Moman testified she did not know the number because she gets a new phone every month. The court asked Moman about the Facebook messages and whether "those go into your messages; don't they?" Moman answered, "Yes. But when you block, she—she had to block me, and everything that ever had to do with [the victim]

or anything, all that gets blocked, too. *** it just takes everything away, unless she unblocks me," including old messages the victim sent to Moman.

¶ 29    Following the hearing and argument by the parties, and after taking the matter under consideration, the trial court denied defendant's motion for a new trial. The trial court discussed Moman's testimony as newly discovered evidence. The court found that Moman's testimony was material and not merely cumulative. The court assumed that evidence of a recantation is material. The court found that if the sanction was an error, it was harmless, because the evidence is not of such a conclusive character that it would probably change the result at trial. In explaining that conclusion, the court found that the evidence was overwhelming, noting evidence that:

1. "The defendant was caught red-handed with his pants down to his ankles hiding behind a victim with her in a state of undress."

2. The victim's testimony was corroborated by the physical evidence and the testimony of the police and Covington.

3. The DNA evidence included DNA "on a condom that had the victim and DNA which was consistent with that of the defendant's." The court stated that,

> "While the DNA match of the defendant was not the one in five million like the other two [(Shorty and Thomas),] if you do the math, it was in the 99[th] percentile. That is strong circumstantial evidence. If you were to believe that[,] this was then a third individual that had the victim's DNA on the condom and had just happened to be that consistent with the defendant's [DNA."]

¶ 30    Apart from the trial evidence, the trial court also found that "Ms. Mowman's [*sic*] credibility is suspect at best." The court made that determination based on finding that the victim's alleged recantation to Moman is "belied by the DNA evidence, circumstantial evidence

of the defendant being found with his pants down to his ankles hiding behind the naked victim." The court noted that Moman did not testify at one of the co-defendant's trial despite telling that co-defendant's girlfriend about the victim's alleged recantation long before the co-defendant's trial began. The trial court also noted that Moman could not recall the phone number of the phone the victim allegedly sent text messages to that would confirm the recantation, and Moman "conveniently lost the SIM card, thus leaving it impossible to independently verify the existence of these text messages." The court also stated that Moman testified that the messages on Facebook are "not there anymore because the victim blocked her and the messages are *** gone." The court found, "Though I don't have a Facebook account, but that seems intuitively to me to be blatantly false. That's the problem with the internet. Once you hit that accept button, the information is out there, you cannot take it back." The court concluded that "where there could be independent verification of what Ms. Mowman [*sic*] has said, she has a convenient excuse where it's not present. So again, I find Ms. Mowman [*sic*] to lack credibility." The trial court denied defendant's motion for a new trial.

¶ 31   Defendant appealed to this court. The issues in defendant's direct appeal were whether the State proved defendant guilty beyond a reasonable doubt of the counts based on accountability for Shorty and Thomas's actions before defendant arrived at the apartment and whether defendant's sentence was constitutionally disproportionate to Shorty's. *Dillon I*, 2015 IL App (1st) 131017-U, ¶¶ 17, 25. This court affirmed defendant's conviction and sentence on direct appeal. *Id.* ¶ 30.

¶ 32   On September 23, 2016, defendant filed a *pro se* petition for postconviction relief. The petition advanced to the third stage and the postconviction court held an evidentiary hearing. Pertinent to this appeal, defendant's trial attorney testified that trial counsel picked the best jury

that he possibly could, given what he had to work with, which was a jury pool that consisted of "a lot of military, a lot of people who had police friends." Defendant's trial counsel was asked, "Was there reasons that you didn't put Jaquita Momon's name on the witness list?" Trial counsel responded, "Well, first of all, we couldn't find her until I think it was at the position of trial because she was out of town, somebody was out of town and gave us this information as to where she was. So we didn't put her name on it because I hadn't spoke to her." On cross-examination, trial counsel was asked whether defendant "had previously given you Ms. Momon's name in advance of trial as a potential witness, is that correct?" Trial counsel responded, "I think he either gave me her name, yeah, I think he, well, I'm sure he gave me her name. It was just our inability to find her, but, yes, he did." Momon's name was also listed in a police report.

¶ 33    Following arguments by the parties the postconviction court issued a written order on defendant's petition for postconviction relief. Relevant to this appeal, the postconviction court found as follows:

> "[Defendant] cannot establish prejudice for failing to list Moman as a
> witness prior to trial, which resulted in a discovery sanction that prevented him
> from calling her in his case-in-chief. Assuming that trial counsel was deficient in
> attempting to locate Moman ***, Moman testified during a post-trial hearing on
> [defendant's] motion for a new trial. At that hearing, she testified as to what she
> would have testified had she been called during trial. The Court found her
> testimony incredible and made the specific finding that her testimony was not of
> such a conclusive nature that it would probably change the result at trial.
> Therefore, [defendant] has not established prejudice resulting from trial counsel's

failure to include Moman on the pre-trial witness list. Without prejudice, the underlying claim of ineffective assistance of trial counsel is meritless. Therefore, appellate counsel was not ineffective for failing to raise it."

¶ 34 The postconviction court also found that appellate counsel "was not ineffective for failing to raise the meritless issue of trial counsel's ineffectiveness for failing to use a peremptory strike on" the juror. Finally, the court found that appellate counsel was not ineffective for failing to raise the issue of the trial court's sanction debarring Moman from testifying because the trial court did not abuse its discretion in imposing the sanction. The postconviction court found that the trial court considered all four factors courts are to consider in fashioning a sanction, the trial court articulated its finding and reasoning for each of the four factors, and additionally, the court found the defense acted in bad faith where the court asked the defense twice prior to reading the names of potential witnesses to the jury and where the defense failed to list Moman in the mandatory disclosures. Therefore, the underlying claim was meritless and appellate counsel was not ineffective for failing to raise it.

¶ 35 The postconviction court denied defendant's postconviction petition in its entirety and dismissed the case.

¶ 36 This appeal followed.

¶ 37                                         ANALYSIS

¶ 38 This is an appeal from an order denying postconviction relief after a third-stage evidentiary hearing. "Once a petition is advanced to the third stage of the process, an evidentiary hearing is held where the trial court may engage in fact-finding and credibility determinations. [Citation.]" *People v. Mendoza*, 2024 IL App (1st) 231588, ¶ 31. Where, as in this case, fact-finding and credibility determinations are involved, "[w]e will not reverse the trial court's

decision after a third-stage hearing unless it is manifestly erroneous." *Mendoza*, 2024 IL App (1st) 231588, ¶ 31 (citing *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006)). "A manifest error is one that is 'clearly evident, plain, and indisputable.' [Citation.]" *Mendoza*, 2024 IL App (1st) 231588, ¶ 31 (citing *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009)). At the third-stage evidentiary hearing, a defendant must make a substantial showing of a constitutional violation to be entitled to postconviction relief. *People v. Carr*, 2020 IL App (1st) 171484, ¶ 24 (citing *Pendleton*, 223 Ill. 2d at 473).

¶ 39    "[T]he right to the effective assistance of counsel *** includes the effective assistance of counsel on appeal ***. [Citation.]" *People v. Young*, 2022 IL App (1st) 210534, ¶¶ 50-51. "As applied to claims involving the failure of appellate counsel to raise a particular issue, the defendant must show that the failure to raise that issue was objectively unreasonable, as well as a reasonable probability that, but for this failure, his sentence or conviction would have been reversed." *People v. Mack*, 167 Ill. 2d 525, 532 (1995). "[A] 'reasonable probability' is defined as a showing sufficient to undermine confidence in the outcome, rendering the result unreliable or fundamentally unfair." *People v. Patterson*, 2014 IL 115102, ¶ 81. "The prejudice inquiry requires that the reviewing court examine the merits of the underlying issue because a defendant cannot suffer prejudice from appellate counsel's failure to raise a nonmeritorious claim on appeal." *People v. Smith*, 2024 IL App (2d) 230539, ¶ 33. "We, therefore, must determine whether [defendant's] underlying *** claim[s] would have been successful if raised on direct appeal." *People v. Childress*, 191 Ill. 2d 168, 175 (2000).

¶ 40    A. Ineffective Assistance of Trial Counsel—Failure to Use Peremptory Challenge

¶ 41    Defendant argues that trial counsel was ineffective in failing to use a peremptory challenge against the potential juror at issue because the potential juror "was equivocal about his

ability to be fair and impartial" and as a result defendant "did not have an impartial jury." Defendant relies on the fact the potential juror initially indicated, during group questioning, that his daughter's rape might affect his ability to be impartial, then, when questioned individually, the trial court used the phrase, "Other than what we discussed about your daughter's experiences" to inquire if the potential juror could be impartial. Defendant interprets the entire exchange to mean that the potential juror stated their impartiality might be affected by the rape but, other than that, nothing else would affect the juror's impartiality, indicating equivocation on the potential juror's ability to be impartial.

¶ 42    "[C]ounsel's actions during jury selection are generally considered a matter of trial strategy. Accordingly, counsel's strategic choices are virtually unchallengeable." *People v. Manning*, 241 Ill. 2d 319, 333 (2011).

> "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be

considered sound trial strategy. [Citations.]" (Internal quotation marks omitted.) *Manning*, 241 Ill. 2d at 334.

¶ 43    In *People v. Johnson*, 215 Ill. App. 3d 713, 723 (1991), this court recognized that the "right to trial by a fair and impartial jury is firmly rooted in our constitution" and "that a violation thereof requires a reversal." *Johnson*, 215 Ill. App. 3d at 723. "[A] venireman is incompetent to sit as a juror if he cannot be impartial." *Johnson*, 215 Ill. App. 3d at 725. "A court may reverse a defendant's conviction where the juror expresses 'self-doubt concerning [his] ability to be impartial.' [Citation.]" *Id.* at 724 (quoting *People v. Stone,* 61 Ill. App. 3d 654, 667 (1978)). "The determination of whether or not a prospective juror is impartial is within the sound discretion of the trial judge. [Citation.] A trial judge's determination will be set aside if it is contrary to the manifest weight of the evidence. [Citation.]" *Johnson*, 215 Ill. App. 3d at 724.

"A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented. [Citation.] Under the manifest weight standard, we give deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and witnesses. [Citation.] A reviewing court will not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn. [Citation.]" *People v. Deleon*, 227 Ill. 2d 322, 332 (2008).

¶ 44    We find that the trial judge in this case did not abuse his discretion in denying the request to remove the juror for cause, and the finding that the juror at issue was impartial is not against the manifest weight of the evidence. In *Johnson*, this court found that the trial court's

determination with respect to three jurors was against the manifest weight of the evidence, and that the defendant's right to a fair and impartial jury was violated, where "[t]hese three jurors all equivocated when they were asked by the trial court whether they could be fair and impartial." *Johnson*, 215 Ill. App. 3d at 724. This court found that the jurors "expressed self-doubt with respect to their ability to be impartial," therefore, the trial judge's determination denying the defendant's challenge for cause was against the manifest weight of the evidence. *Id.* at 725. Like the potential juror at issue in this case, the three jurors in *Johnson* testified that a family member had been the victim of a crime, some of which were violent crimes. *Id.* However, that is where the similarity ends. In *Johnson*, when asked if their ability to be fair and impartial would be negatively affected, the jurors responded, "I hope not;" "Not really;" and "I don't think so." The trial judge in *Johnson* attempted to get a "more concrete answer" from the juror who responded, "I don't think so;" but the juror initially "refused to give an affirmative answer," instead repeating his answer, "I don't know." *Id.* at 724. "Only after further questioning by the trial court did [the potential juror] profess his ability to remain impartial." *Id.* The juror did not testify that he could be an impartial juror until the trial judge asked a leading question. *Id.* at 726.

¶ 45    The potential juror's responses to the trial court's questioning in this case were not equivocal. Unlike the jurors who responded, "I hope not;" "Not really;" and "I don't think so," when asked if they could be impartial, the potential juror in this case responded with a clear, unequivocal, "Yes." In *People v. Jerry Johnson*, 162 Ill. App. 3d 952 (1987), this court found:

> "The response of [the] juror ***, while somewhat equivocal upon the
>
> court's initial general inquiry, was not such that it could be determined that she
>
> could not be impartial. The trial court properly probed into her possible biases ***
>
> by asking her whether her feelings would cloud her ability to be impartial. She

was further asked whether she would be able to 'set aside her natural abhorrence of weapons and judge this on the facts in this case and not based on what [she felt] or [didn't] feel.' [The juror] replied that she 'would try.' The trial court was in a position to evaluate this response and fairly decide its candor. [Citation.] Having reviewed the record thoroughly, we conclude that the trial court's denial of [the] defendant's challenge for cause was not improper." *Jerry Johnson*, 162 Ill. App. 3d at 954-55.

¶ 46     In *Jerry Johnson*, this court found it sufficient that a potential juror expressed that they would "try" to be impartial to conclude that the defendant's right to an impartial jury was not violated. *Id.* at 954-55. The potential juror's responses that he could be impartial in this case were more certain than the potential juror's responses in *Jerry Johnson*. The defendant's characterization of the trial court's exchange with the potential juror as indicating that the potential juror retained an expressed doubt about his ability to be impartial strains credulity. The trial court was clearly questioning the potential juror about his impartiality in light of his daughter's rape and the potential juror expressed they could be impartial. Then, for the sake of certainty, the trial court asked the potential juror if there were any additional matters they should discuss. The conclusion that the potential juror in this case had any doubt about his ability to be impartial is not clearly evident, nor is the trial court's conclusion that the potential juror could be impartial, unreasonable, arbitrary, or not based on the evidence presented.

¶ 47     Defendant argues that trial counsel's decision not to use a peremptory challenge in this case was not trial strategy, seemingly because trial counsel initially moved to excuse the juror for cause and had peremptory challenges left when trial counsel accepted the juror. We disagree. In *People v. Jones*, 2012 IL App (2d) 110346, ¶ 67, the defendant argued that trial counsel was

ineffective in failing to strike a juror who was allegedly biased. When the defendant's trial counsel questioned the juror in that case, "defense counsel had not used any of his peremptory challenges and used only one such challenge during the entirety of *voir dire*." *Id.* ¶ 70. On appeal, the defendant argued that the questioned juror acknowledged that he would give more credibility to a police officer's testimony than that of a lay person. *Id.* ¶ 70. The defendant argued that trial counsel's failure to remove the juror was not "strategy" but forgetfulness under the circumstances. *Id.* ¶ 72. The *Jones* court disagreed for multiple reasons. First, the court found that

> "[the] defendant's argument focuses primarily on [the juror's] last response, which he argues shows that [the juror] 'definitely' would find police officers more credible. However, by isolating [the juror's] final answer, [the] defendant inflates its significance and takes it out of context. Contrary to [the] defendant's approach, the entire *voir dire* must be considered, meaning that it is improper to focus on one answer or a 'few answers' that skew the analysis of whether defense counsel was deficient." *Jones*, 2012 IL App (2d) 110346, ¶ 73.

¶ 48    Additionally, the *Jones* court found that "other cases have found defense counsel's failure to remove a juror to be a matter of trial strategy even when the juror made considerably stronger statements about their potential inability to be impartial." *Id.* ¶ 74.

¶ 49    We find that defendant focusses primarily on the fact the potential juror in this case raised his hand when the trial court asked the entire venire whether there was anything that might affect their impartiality and the potential juror reported his daughter's rape—at which time trial counsel asked to excuse the potential juror for cause, before the trial court questioned the potential juror about their bias. However, based on the entire questioning of the juror, we find

that trial counsel's performance was not deficient because trial counsel failed to use a peremptory strike against the potential juror at issue, where "the totality of [the potential juror's] responses showed that he could be fair and impartial, [thus,] it was a matter of trial strategy for defense counsel to accept him as a juror." *Jones*, 2012 IL App (2d) 110346, ¶ 73. Here, as in *Jones*, "defense counsel could have found [the potential juror] was particularly forthright, humble, and honest and was not unequivocally biased." *Jones*, 2012 IL App (2d) 110346, ¶ 77 (citing *Manning*, 241 Ill. 2d at 335 ("Considering the entire *voir dire* *** in context, it is possible that [the] defendant's trial counsel decided that [the juror] was not unequivocally biased.")). There is no evidence that the juror was not impartial; therefore, defendant's right to an impartial jury was not violated. Because defendant cannot show trial counsel's performance was deficient, appellate counsel was not ineffective in failing to raise the meritless claim on appeal. *Smith*, 2024 IL App (2d) 230539, ¶ 33. The postconviction court properly denied defendant's postconviction petition as to this claim.

¶ 50                    B. Ineffective Assistance of Counsel—Discovery Sanction

¶ 51      Next, defendant argues that appellate counsel was ineffective in failing to argue on direct appeal that the trial court abused its discretion when it barred Moman as a witness as a discovery sanction. "The determination as to an appropriate sanction for a discovery violation lies within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion." *People v. Scott*, 339 Ill. App. 3d 565, 572 (2003). "That said, however, we observe that few rights are more fundamental than an accused's Sixth Amendment right to present witnesses in his own defense." *Id.* at 572.

        "Factors which the trial court should consider in determining whether the
    exclusion of a witness is an appropriate discovery sanction are the effectiveness of

a less severe sanction, the materiality of the witness' proposed testimony to the outcome of the case, the prejudice to the other party caused by the testimony, and evidence of bad faith in the violation of the discovery rules. [Citation.] In order to determine whether the trial court abused its discretion in barring [a witness] from testifying on the defendant's behalf, we must consider these factors in the context of the factual circumstances of this case. [Citation.]" *Scott*, 339 Ill. App. 3d at 573.

¶ 52 "[I]n *Taylor v. Illinois,* 484 U.S. 400 (1988), the United States Supreme Court rejected the proposition that the sanction of excluding a defense witness from testifying is never appropriate and always constitutes a violation of a defendant's Sixth Amendment rights." *Scott*, 339 Ill. App. 3d at 573. Furthermore, "the commission of an error of constitutional dimension does not require reversal of the conviction if the error is harmless beyond a reasonable doubt." *People v. Cline*, 60 Ill. 2d 561, 566 (1975).

¶ 53 Defendant argues that the trial court abused its discretion in barring Moman because that sanction "was unwarranted and undercut the goal of truth seeking at [defendant's] trial." Defendant argues the sanction was "unwarranted" because the trial court's finding that trial counsel acted in bad faith in failing to disclose Moman "was not based on the evidence," the sanction does not contribute to the goal of truth seeking, and other sanctions—against trial counsel personally—were available, including granting the State a continuance to speak to Moman. Defendant concedes that "this Court will *** find a circuit court's error in barring defense evidence harmless if it can say beyond a reasonable doubt that the jury's verdict would have been the same, [had] it heard the testimony." See *Scott*, 339 Ill. App. 3d at 579 ("The trial court's order barring *** testimony can be considered harmless error only if we can say beyond

a reasonable doubt that the jury's verdict would not have been different had it been allowed to hear [the testimony.]" (citing *People v. Damico,* 309 Ill. App. 3d 203, 214 (1999))). In this case, defendant argues it cannot be said beyond a reasonable doubt that the jury's verdict would have been the same had it heard Moman's testimony because Moman would have impeached L.H.'s testimony, the evidence against defendant was not overwhelming, and the trial court's conclusion that Moman's testimony lacked credibility was flawed.

¶ 54　Alternatively, defendant argues that appellate counsel was ineffective for failing to argue that trial counsel provided ineffective assistance by failing to disclose Moman as a witness. "Under the two-prong test articulated in *Strickland* \*\*\*, a defendant is deprived of the effective assistance of counsel when (1) counsel's performance was deficient, in that it fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced the defense." *People v. Evans*, 2017 IL App (1st) 143268, ¶ 45. "For the second *Strickland* prong, the defendant must show that there is a reasonable probability that the outcome of the proceeding would have been different if not for counsel's unprofessional errors." *Id.* ¶ 47. "To make this finding, the court must consider the totality of the evidence before the court. [Citation.]" *People v. King*, 316 Ill. App. 3d 901, 917 (2000). "[I]f the defendant cannot demonstrate prejudice, the reviewing court need not decide whether the underlying conduct was deficient." *People v. Guerra*, 2020 IL App (1st) 171727, ¶ 25.

¶ 55　Defendant argues that trial counsel's performance was deficient, and that the deficient performance prejudiced defendant in that, but for trial counsel's deficient performance, there is a reasonable probability of a different outcome, because Moman would have impeached L.H.'s testimony. Defendant argues that to establish prejudice from trial counsel's performance he only needed to show by a preponderance of the evidence that there was a reasonable probability that

the outcome of his trial would have been different had trial counsel disclosed Moman and called her as a witness. Defendant noted that the postconviction court that denied defendant's postconviction petition "relied on the prior [trial] court judge's post-trial assessment of Moman's testimony as inconclusive and incredible," but argues that the trial court's findings were not supported by the record or the law.

¶ 56    Defendant's arguments that appellate counsel was ineffective in failing to challenge the trial court's discovery sanction on direct appeal and in failing to argue that trial counsel was ineffective in failing to disclose Moman before trial, resulting in the discovery sanction, both turn on the impact of Moman's testimony on defendant's trial and whether the outcome would have been different had Moman testified. We find, beyond a reasonable doubt, that the outcome of defendant's trial would not have been different had the jury heard Moman's testimony and, therefore, there is no reasonable probability the outcome of the trial would have been different had trial counsel disclosed Moman as a witness.

¶ 57    Defendant devoted a large portion of the argument to the materiality of Moman's testimony. We find Moman's testimony would have been "material" in that the testimony "is relevant and probative of [defendant's] innocence." *People v. Robinson*, 2020 IL 123849, ¶ 47. We do not agree with defendant, however, that the trial court's assessment of Moman's credibility and the totality of the evidence was erroneous.

¶ 58                                    1. Credibility

¶ 59    The postconviction court must make credibility determinations at a third-stage evidentiary hearing. *Mendoza*, 2024 IL App (1st) 231588, ¶ 31. In this case the postconviction court relied on the record and findings made by the trial court. This court may consider the entire record to evaluate defendant's postconviction claims. See *People v. Wease*, 44 Ill. 2d 453, 457

(1970) ("Upon examination of the entire report of proceedings *** we find [the] defendant's argument to be without substance."). A trial court's credibility assessments will be reversed only when they are against the manifest weight of the evidence. *People v. McDaniel*, 326 Ill. App. 3d 771, 780 (2001) (citing *People v. Buss,* 187 Ill. 2d 144 (1999)). "A trial court's judgment is against the manifest weight of the evidence when its findings appear to be unreasonable, arbitrary, or not based on the evidence." *McDaniel*, 326 Ill. App. 3d at 780.

¶ 60     The trial court found that Moman's testimony was not credible in part because the trial court found that the victim's alleged recantation to Moman is belied by the evidence. Specifically, the trial court noted evidence that:

1.  "The defendant was caught red-handed with his pants down to his ankles hiding behind a victim with her in a state of undress."

2.  The victim's testimony was corroborated by the physical evidence and the testimony of the police and Covington.

3.  The DNA evidence included DNA "on a condom that had the victim and DNA which was consistent with that of the defendant's."

¶ 61     We find, and discuss further below, that the evidence against defendant is overwhelming, and undermines Moman's credibility.

¶ 62     The trial court also found that Moman is not credible because Moman did not testify at Shorty's trial, despite being first contacted in relationship to this case by Shorty's girlfriend; and because Moman's testimony that she could no longer retrieve the messages that she claimed would corroborate her testimony was not believable. We cannot say the trial court's finding that Moman is not a credible witness is unreasonable, arbitrary, or not based on the evidence. *McDaniel*, 326 Ill. App. 3d at 780. Moman allegedly had no involvement with the prosecution of

these defendants before Shorty's girlfriend contacted Moman via Facebook. There is no credible explanation for why Moman would not have testified at Shorty's trial, but she did not. The trial court could rely on that evidence as grounds to call Moman's credibility into doubt. *Aliano v. Transform SR LLC*, 2020 IL App (1st) 172325, ¶ 21 ("Testimony that is so inherently improbable as to be contrary to common experience must be rejected."). Furthermore, Moman was aware of the importance of the Facebook and text messages from L.H. that would have allegedly corroborated L.H.'s recantation, yet Moman took no steps to protect them and, when asked to produce them, gave an excuse for their absence. It is not dispositive whether or not the trial judge had a Facebook account, as defendant suggests; what is dispositive is that based on its observations of Moman's testimony, the trial court could reasonably conclude that Moman's testimony that she could not retrieve the messages was not credible. " '[T]he trial judge *** is in a position superior to a court of review to observe the conduct of the witnesses while testifying, to determine their credibility, and to weigh the evidence.' [Citation.]" *People v. Whitaker*, 2024 IL App (1st) 232009, ¶ 47. We also find that Moman's lack of credibility is corroborated by Moman's lack of cooperation with all parties to this case. After initially speaking to an investigator from the prosecutor's office, Moman admits she purposely avoided further contact.

¶ 63     The finding that Moman is not credible is not manifestly erroneous.

¶ 64                                   2. Evidence

¶ 65     The trial court also found that Moman's testimony would not have changed the outcome of the trial. We agree. Based on our review of the evidence, we find beyond a reasonable doubt that had trial counsel disclosed Moman as a witness and Moman testified at defendant's trial the outcome would not have been different. The victim's, Covington's, and the officers' testimony, and the DNA evidence, establish that the inability to call Moman as a witness to contradict the

victim's testimony did not harm or prejudice defendant. We find the court's decision in *Damico* instructive.

¶ 66    In *Damico*, the defendant was convicted of aggravated battery and aggravated arson. *Damico*, 309 Ill. App. 3d at 206. Two witnesses provided alibi testimony. *Id.* at 207. One of those witnesses testified that an eyewitness who was present when the offense was committed told the alibi witness that they (the eyewitness) had committed the battery of the victim. *Damico*, 309 Ill. App. 3d at 211. Defense counsel had failed to disclose a summary of the witness's statement about the other person allegedly stating they had committed the battery, and the State requested that the testimony be stricken. *Id.* at 211-12. The trial court, without finding that defense counsel acted willfully or blatantly, or sought to gain some tactical advantage (*id.* at 213), "concluded that the exclusion of the testimony was required by the supreme court rules" and "instructed the jury that they were to disregard" the testimony (*Damico*, 309 Ill. App. 3d at 212).

¶ 67    On appeal, the court found that the trial court had abused its discretion in excluding the testimony "rather than imposing a lesser sanction on the defendant that would have cured any prejudice to the State." *Id.* at 214. Nonetheless, the *Damico* court found that "[g]iven the evidence of the defendant's guilt in this case, we conclude that the error in excluding the testimony of the defendant's witness *** was harmless beyond a reasonable doubt." *Damico*, 309 Ill. App. 3d at 214. The court found that the witness's credibility was questionable, because the jury had rejected the same witness's alibi testimony. *Id.* at 214. The court also noted that the victim positively identified the defendant, two eyewitnesses testified to defendant's involvement in the offense, and two other witnesses provided circumstantial evidence of the defendant's guilt (in the form of testimony that the defendant had been recruited to "scare" the victim and to

seeing the defendant with the murder weapon immediately after the offense). *Damico*, 309 Ill. App. 3d at 214. Thus, despite finding that the trial court erred in excluding the testimony, based on the strength of the evidence against the defendant, the court found that the trial court's error was harmless beyond a reasonable doubt. *Id.* at 213-14.

¶ 68    In this case, we similarly find that in light of the evidence, any error in excluding Moman's testimony (a question we need not and do not decide) was harmless beyond a reasonable doubt. The evidence in this case is comparable to the evidence in *Damico*.

¶ 69    We have determined that the court's finding that Moman is not credible is not against the manifest weight of the evidence. Moman testified that the victim stated the sex was voluntary. However, Covington was a witness with no interest in the case and testified that she heard men threatening and striking a woman, and forcing the victim to commit sex acts. What Covington heard was disturbing enough that Covington called police and reported that men were raping a girl. L.H. identified defendant as her attacker, and never wavered in her testimony that defendant sexually assaulted her. L.H. made an immediate outcry when police arrived and said that she was raped and never equivocated in her statements, except allegedly to Moman, who is not a credible witness.

¶ 70    DNA that matched defendant's DNA was recovered from the inside and outside of a condom that also contained the victim's DNA. Experts testified the major component of DNA found on the condom in exhibit 6 matched defendant and occurred in only one in 1,500 unrelated males.

¶ 71    The possible donors of the DNA on exhibit 6 were defendant and the two codefendants. Because the DNA matched defendant, not the two codefendants, the evidence is strong that defendant was the donor. We agree with the trial court that DNA is "strong" evidence. DNA

evidence conclusively identified defendant as a person who had sex with the victim where the victim reported she was sexually assaulted. Despite not being the one in millions match of other DNA evidence, the probability that someone other than defendant was the source of the DNA at issue is too great to give rise to a reasonable doubt.

¶ 72   There was also additional circumstantial evidence of defendant's guilt contemporaneous with the offense. The evidence was that police arrived and caught defendant with his pants down, behind the half-naked victim, in the place where Covington reported the assault was taking place. Police observed defendant hiding and trying to pull his pants back up. Although neither officer testified that defendant was "hiding" behind the victim, there was testimony that a police officer saw defendant partially "tucked in" behind a partition wall. We cannot say the inference that defendant was "hiding" is clearly, plainly, and indisputably erroneous. Defendant also argues that there was no testimony that defendant's pants were actually "around his ankles." We find that argument unpersuasive and nothing more than a distraction from the evidence; the officer testified that defendant's pants were down and defendant was trying to pull them back up. It is contrary to human experience that in this situation police would testify that defendant's pants were down and defendant was trying to pull them up if defendant's pants were merely "sagging." It is reasonable to conclude that police interrupted defendant's assault on the victim and defendant hastily tried to pull his pants back up.

¶ 73   In sum, Moman's testimony that the victim said that the sex was voluntary is unbelievable and is contradicted by the testimony of an uninterested witness who heard a sexual assault taking place and called police, the testimony of police who practically caught defendant in the act, and highly persuasive DNA evidence. After reviewing all of the evidence in this case, Moman's testimony is not credible or compelling. Therefore, we find beyond a reasonable doubt

that had Moman testified, the result of the trial would not have been different. Therefore, there is no reasonable probability the outcome of the trial court have been different absent trial counsel's deficient performance. *People v. Velasco*, 2018 IL App (1st) 161683, ¶ 146 ("The court's findings of fact and credibility determinations were not manifestly erroneous, and they support the court's determination that counsel's alleged failure to properly investigate and present the alibi witnesses did not prejudice defendant, as there is no reasonable probability that the result of the trial would have been different had the witnesses testified.")

¶ 74    We find that a challenge to the trial court's sanction lacked merit because any error in barring Moman as a witness was harmless beyond a reasonable doubt. We also find that defendant's ineffective assistance of trial counsel claim similarly lacked merit. Therefore, appellate counsel's failure to raise those claims did not prejudice defendant. There is no reasonable probability that had appellate counsel argued either claim defendant's conviction would have been reversed and defendant would have received a new trial.

¶ 75    Trial counsel's performance was not deficient for failing to strike the juror at issue, and defendant was not prejudiced by trial counsel's deficient performance in failing to disclose Moman before trial; therefore appellate counsel was not ineffective in failing to raise either claim on direct appeal, and any error in the trial court's sanction was harmless beyond a reasonable doubt.

¶ 76                                    CONCLUSION

¶ 77    For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 78    Affirmed.